**UNIVERSAL CITY STUDIOS, INC., a corporation, dba Universal Television and Universal Pictures, and Walt Disney Productions, a corporation, Plaintiffs,**

v.

**SONY CORPORATION OF AMERICA, a corporation, the Sony Corporation, a corporation, Carter Hawley Hale Stores, Inc., a corporation, Associated Dry Goods Corporation, a corporation, Federated Department Stores, Inc., a corporation, Henry's Camera Corporation, a corporation, Doyle Dane Bernbach, Inc., a corporation, and William Griffiths, Defendants.**

No. CV 76–3520–F.

United States District Court,
C. D. California.

Oct. 2, 1979.

As Amended Dec. 5, 1979.

Stephen A. Kroft, John G. Davis, Edwin M. Smith, Rosenfeld, Meyer & Susman, Beverly Hills, Cal., for plaintiffs.

Dean C. Dunlavey, Donald E. Sloan, Gibson, Dunn & Crutcher, Los Angeles, Cal., ·Max Freund, Ambrose Doskow, and Joel Sternman, Rosenman, Colin, Freund, Lewis & Cohen, New York City, for defendants

432

Sony Corp. of America, Sony Corp. and Doyle Dane Bernbach Intern., Inc.

Marshall A. Rutter, Warren G. Greene, Rutter & Ebbert, Los Angeles, Cal., for defendants Carter Hawley Hale Stores, Inc., Associated Dry Goods Corp., Federated Department Stores, Inc. and Henry's Camera Corp.

FERGUSON, District Judge.

Article I, § 8, Cl. 8 of the United States Constitution empowers Congress: "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." The Copyright Act passed by Congress in 1909 and revised in 1976 gives authors exclusive rights over some but not all uses of their works. As the Supreme Court wrote in *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1974):

> The limited scope of the copyright holder's statutory monopoly, like the limited copyright duration required by the Constitution, reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts. (footnotes omitted).

This case tests the scope of copyright protection for audiovisual material broadcast on public airwaves, and its resolution requires balancing of strong competing claims.

Plaintiffs, Universal City Studios, Inc. ("Universal") and Walt Disney Productions, Inc. ("Disney"), are producers and copyright owners of audiovisual material, some of which they choose to sell for telecast over public airwaves. Defendants include the manufacturer, Sony Corporation ("Sony"), and the distributor, Sony Corporation of America ("Sonam"), of the "Betamax," a videotape recorder ("VTR") which can record this telecast off-the-air and make a copy of the audiovisual material which can be viewed at another time. Other corpo-

rate defendants are certain retail stores (Carter Hawley Hale Stores, Inc.; Henry's Camera Corporation; Associated Dry Goods Corporation; and Federated Department Stores, Inc.) which sell the Betamax, and the advertising agency, Doyle Dane Bernbach, Inc. ("DDBI") which promotes it. The only individual defendant is William Griffiths who used his Betamax in his home to copy plaintiffs' broadcast material for his own home use.

Plaintiffs' main contentions are that this recording and that of other individuals infringed their copyrights and that the corporate defendants are either direct or contributory infringers or are vicariously liable for the infringement. Plaintiffs also contend that defendants have interfered with their business relations and unfairly competed with them. Finally, plaintiffs assert that the retail defendants violated copyright law when they recorded portions of plaintiffs' programs to demonstrate the Betamax to a prospective purchaser.

Plaintiffs allege that they will suffer great monetary damage if this infringement is allowed to continue. Defendants contend that home copying for home use is not an infringement and, even if it were, defendants could not be held responsible under any theory of infringement or vicarious liability. The resolution of these issues first requires a determination of whether Congress gave authors monopoly power over this use and, if so, whether the corporate defendants are in any way liable. As will be discussed, these determinations are not easily made. Protection of the public interest requires balancing the need for wide availability of audiovisual works against the need for monetary reward to authors to assure production of these works.

After three years of litigation, five weeks of trial and careful consideration of extensive briefing by both sides, this court finds:

a) Neither the Copyright Act of 1909 ("Old Act") nor the revised Act of 1976 ("New Act") gave copyright holders monopoly power over an individual's off-the-air copying in his home for private, non-commercial use. This

court is not deciding whether tape duplication or copying from pay television is prohibited. Nor is this court ruling on off-the-air recording by individuals or groups for use outside the home.

b) Even if the Copyright Act did prohibit home-use copying, Sony, Sonam, DDBI and the retail stores would not be liable under any of the theories of direct or contributory infringement or vicarious liability.

c) The retail defendants have not infringed plaintiffs' copyrights.

d) Even if home-use copying were infringement and defendants were deemed liable therefor, this court could not grant the injunctive relief requested by plaintiffs.

e) None of the defendants has unfairly competed with plaintiffs or interfered with their advantageous business relations.

In so holding, this court makes the following factual findings.

*THE PARTIES*

Plaintiff Universal is a Delaware corporation with its principal place of business in Los Angeles County, California. Universal has done business under its own name and under the names, among others, of Universal Television, Universal Pictures, Universal 16 and United World Films. Universal is a wholly owned subsidiary of MCA, Inc. ("MCA"). Plaintiff Disney is a California corporation with its principal place of business in Orange County, California. Both Universal and Disney produce movies and other audiovisual works for theatrical and television exhibition.

Defendant Sony Corporation is a corporation duly organized and existing under the laws of the Country of Japan. Sony manufactures the Betamax videotape recorder. Defendant Sony Corporation of America is a New York corporation with its principal office in Los Angeles County, California. Sonam is a corporation duly organized and existing under the laws of the State of New York and qualified to do business and doing business in the State of California. Sonam distributes the Betamax in the United States.

Defendants Carter Hawley Hale Stores, Inc. ("Carter Hawley") and Henry's Camera Corporation ("Henry's Camera") are California corporations. Defendant Associated Dry Goods Corporation ("Associated/Robinson") is a Virginia corporation and defendant Federated Department Stores, Inc. ("Federated/Bullock's") is a Delaware corporation. All of these retail stores (the "retail defendants") do business in Los Angeles County, California and sell the Betamax.

Doyle Dane Bernbach, Inc. is a corporation duly organized and existing under the laws of the State of New York, and is and at all times material to this action was, doing business in Los Angeles County, California. DDBI is an advertising agency retained by Sony to advertise the Betamax.

Defendant William Griffiths is a resident and citizen of California and is an owner and user of the Betamax.

*UNIVERSAL'S PRODUCTS*

Universal produces motion pictures for exhibition in theaters and for television. Some of those released to theaters are subsequently licensed for television exhibition, either to pay television or to network television. Network telecasts generally consist of two or three runs. After network licensing and exhibition, Universal may license its theatrical motion pictures to local television stations in syndication (generally for three to eight runs) and occasionally will then redistribute them to the theaters. Universal also offers some of its theatrical motion pictures or excerpts thereof for rental to consumers, schools and institutions in the "non-theatrical" 16 mm and 8 mm exhibition markets.

Universal also recently began marketing theatrical motion pictures on prerecorded videodiscs. Many of these motion pictures were previously exhibited on television. In the future, Universal plans to release theatrical motion pictures on discs before the first television exhibition as well as after the motion pictures have been televised.

Universal's made-for-television motion pictures consist of television features, weekly series and novels made for television (i. e., "mini-series"). With the exception of "Operation Prime Time," these motion pictures are first exhibited on network television. Universal's first run network licenses of series are usually executed before production starts and are for two showings of each episode in the year of production, with an option to renew for each of the next four years. The number of yearly episodes of a series normally runs from 13 to 22. Universal executives testified at trial that the first run network license fee normally does not cover the cost of production of a series.

In recent years Universal has produced mini-series which are first licensed to a group of approximately 100 local stations under the title "Operation Prime Time." Licenses for these mini-series are also available on an ongoing basis to additional local stations. The Operation Prime Time licenses are generally for six runs with many of the stations telecasting the first two runs within seven days of each other.

After Universal's television products have been shown on network, approximately half of them are licensed for rerun exhibition on late night network, on network daytime television, and/or by syndication. A syndication requires approximately 60-120 episodes, which means 3-5 years of successful first run network exhibition if the package is all of one series. Syndication licenses of a successful series may be executed as early as the third year of first run network exhibition, but the syndication exhibition does not begin until after the fifth year. Once programming has been syndicated, it seldom goes back to network.

Series are syndicated for approximately six showings of each episode over 4-6 years; theater films are syndicated for 3-8 showings each over 3-6 years. Universal has approximately 54 series available for syndication and is adding new ones at a rate of two or three a year; it has approximately 2000 theater films in syndication, available by groupings. Altogether, it has over 3000 syndication licenses covering more than 300,000 different programs.

## DISNEY'S PRODUCT

Disney has an extensive film library of animated and live action films resulting from 52 years of motion picture production for theater. Included in the library are approximately 24 feature length programs (both animated and live action) which Disney regards as "classics." These classics are exhibited only in theaters and are re-issued approximately every 7-10 years. They include such titles as *Snow White, Mary Poppins* and *Jungle Book.* Only three of Disney's feature length animated films have ever been licensed to television.

Disney licenses many of its other theatrical motion pictures to television, generally first for network exhibition and thereafter to pay television. On at least one occasion, however, Disney licensed a motion picture to pay television before licensing to network. Disney has not to date licensed any of its theatrical motion pictures in syndication. Many of Disney's theatrical motion pictures have been the subject of one or more network reruns. After network exhibition, Disney, like Universal, licenses some of its theatrical motion pictures for 16 mm rental. It also licenses excerpts of some for sale on 8 mm film. Within the past year, Disney has also offered some of its theatrical motion pictures for sale on videodisc.

Disney's library includes approximately 500 cartoons, each being 6-8 minutes in length. These cartoons receive varying kinds of exhibition, on a revolving basis, including theatrical, rental in the form of 16 mm full length films, and sale in the form of 8 mm excerpts.

The only programming currently licensed by Disney to a network is the one hour, weekly *Wonderful World of Disney*—pursuant to a contract with NBC executed in late 1977 and expiring in the fall of 1981. The license calls for Disney to supply 24 "new" programs and 24 "repeat" programs each twelve months, with one lump sum being paid for four of these new programs and a uniform fee being paid each time Disney delivers one of the other 20 new programs. In the 1977-78 television season,

six of the new programs were created for the series and the other 18 new programs came from Disney's library. The uniform fee per new show covers about 75% of the cost of each program created for the series and exceeds the cost of providing each of the "new" programs from Disney's library.

Programming supplied to NBC never is syndicated or licensed to others during the term of the contract but will be available later.

The only Disney programming now being exhibited by syndication is the New Mickey Mouse Club. This is a series of 104 half-hour episodes which was once syndicated in approximately 60 television markets and is now tailing out in the last 30 or 40 of these markets. This series is out of production and no new syndication licenses are being made.

## BETAMAX AND OFF-THE-AIR RE-CORDING

Three components are required to record off-the-air and play back on the average television set: (a) the videotape recorder; (b) the tuner; and (c) the radio frequency adapter. When audiovisual materials are televised, the broadcaster telecasts radio frequency ("RF") signals over the public airwaves. The videotape recorder alone, however, does not receive and record these signals. A tuner is necessary to receive the RF signals and change them to audio and video signals. These signals are the ones recorded on the magnetic tape of the videotape recorder. To play this tape back on a regular TV or a monitor, an RF adapter is necessary to convert the audio-video signals to RF signals.

The Betamax machines contain all three components. Before Betamax, as early as 1965, Sony manufactured other videotape recorders—some of them with built-in adapters and tuners and others without. Sony and other manufacturers market and sell separately all three components. Thus, even without the Betamax machines, a person could assemble a system for off-the-air recording after purchasing the components separately.

The Betamax machine is marketed in at least four models: LV 1901, SL 7200, SL 8200 and SL 8600. These models vary in the options they offer. The SL 8600, for example, has a built-in timer and a remote pause control. The SL 8200 has a slowdown capacity which allows one to record two hours of material on a one-hour tape. These recorders range in price from approximately $875–$1000.

Sony also manufactures and sells tape cassettes for the various Betamax models. Some of these tapes can be used with only one particular Betamax model. None of the Sony cassette tapes can be used with other manufacturers' videotape recorders. The longest cassette tape made by Sony allows three hours of recording. The price for this 3-hour tape is approximately $21.

The Betamax tuner and RF reception capability is not dependent on the television set to which it is attached for playback. Betamax can record broadcasted material on one channel while the television set is off or is receiving and showing signals on another channel. Thus it is possible to view one show while taping another and to tape a show while not viewing at all, or even while away from home. This latter function is possible because the Betamax also includes a timer which can be set automatically to activate the recording system at a certain time.

The Betamax also includes a pause button and a fast forward capability. Sony has also developed remote control pause buttons and these are part of the 8600 model. Even prior to this, however, such devices could be added to one's system. The pause button allows an operator to stop whatever function—record, play, fast-forward, reverse—the machine is in. Therefore, if the individual views the material while it is being recorded and decides he doesn't want something on the tape, he can use the pause button to omit that segment of the broadcast from the recording. Of course, an individual must be both present and viewing to do this.

The fast forward makes it possible to avoid watching on playback a segment that

has been recorded. While viewing the tape, an individual can fast forward through an undesired segment. For the most part, however, the viewer must guess as to when the undesired segment has been passed.

The Betamax and other Sony videotape recorders can also record signals from a video camera. Thus it is possible to purchase a camera, plug it into a videotape recorder, and make one's own film on a videocassette. This can then be played back on a monitor.

## ADVERTISING

DDBI is Sonam's advertising agency for consumer products. Since the introduction of the first Betamax model, DDBI, in cooperation with Sonam, has created and published Betamax advertisements for magazines, newspapers and television. In November, 1975, Sonam agreed to indemnify DDBI for any liability arising from this advertising campaign.

Many of these national ads for the Betamax have been introduced into evidence. Some of these exhort the public to "record favorite shows" or "build a library." Some have suggested recording "novels for television" and "classic movies." None of the Betamax advertisements warns that recording copyrighted shows is or may be a copyright infringement.

In addition to the DDBI national advertising campaign, Sonam operates a cooperative advertising program. Under this program, individual franchise dealers write and place ads for the Betamax and, if Sonam approves the ads, the local dealer receives 5% of the cost of the ads as a credit to the balance owed Sony for previously purchased merchandise.

Henry's Camera has participated in this program and has received credit for advertisements with "record your favorite show" and "build a library" language.

## WARNINGS

None of the Betamax models or the brochures describing them contains warnings about copyright infringement. Pre-Betamax videotape recorders manufactured by Sony (the U–Matic, AV and CV series) had a small plate attached to the back stating: "This videotape recorder is not to be used to record copyrighted works."

The Betamax operating instructions, however, include a warning about possible copyright infringement. On page 17 of the instruction booklet, the following language appears: "Television programs, films, videotapes and other materials may be copyrighted. Unauthorized recording of such material may be contrary to the provisions of the United States copyright laws." The Betamax machine and this accompanying booklet are delivered to the purchaser in a sealed box.

The Betamax warranty states that there shall be no liability on the part of the manufacturer, distributor or seller for any loss or damage arising directly or indirectly from the use of the Betamax.

## EVIDENCE OF HOME–USE COPYING

### A. William Griffiths

Defendant William Griffiths started recording television programs off-the-air in 1973 or 1974 using a pre-Betamax videotape recorder made by Sony. He then learned about the Betamax while he was in Japan and instructed his sons to buy him one in the United States at the first opportunity. Griffiths owns a model 7200 purchased by his sons from defendant Henry's Camera. Griffiths never spoke to anyone at Henry's Camera about Betamax, and he was not induced to buy his Betamax by virtue of any advertisements. He owns approximately 100 tapes. When Griffiths bought his Betamax, he intended not only to time-shift (record, playback and then erase) but also to build a library of cassettes. Maintaining a library, however, proved too expensive, and he is now erasing some earlier tapes and reusing them.

Griffiths copied about 20 minutes of a Universal motion picture called "Never Give An Inch," and two episodes from Universal television series entitled "Baa Baa Black Sheep" and "Holmes and Yo Yo." He would have erased each of these but for the request of plaintiffs' counsel that it be kept. Griffiths also testified that he had

copied but already erased Universal films called "Alpha Caper" (erased before anyone saw it) and "Amelia Earhart." At the time of his deposition, Griffiths did not intend to keep any Universal film in his library.

Griffiths has also recorded documentaries, news broadcasts, sporting events and political programs such as a rerun of the Nixon/Kennedy debate.

Griffiths is a client of plaintiffs' law firm and consented to being a defendant in the lawsuit. Plaintiffs have waived any claim for damages or costs against Griffiths for his activities alleged in the complaint. Plaintiffs never expected Griffiths to be represented by counsel and he has not been.

### B. *Marc Wielage*

Mr. Wielage is not a defendant in this case. Plaintiffs do allege, however, that the corporate defendants are liable for any infringement of plaintiffs' copyrights by him.

Wielage is a video equipment salesman, he has an FCC license authorizing him to adjust commercial television transmitters, and he has been employed in the past as a professional switcher (between programs and commercials) at commercial television stations. The Betamax is Wielage's primary hobby; he even has a padded suitcase which he uses to carry his Betamax on trips with him. Wielage owns three Betamax recorders—a 7200, an 8200, and an SLO 320. He uses the SLO 320 with an outboard tuner and he has modified the other two. He owns approximately 340 Betamax tapes.

Wielage was recording television programs with a U–matic 1600 before Betamax was available. He knew videotape collectors and library builders who owned and used the U–matic to record off-the-air prior to Betamax. He bought Betamax because it was the first videotape recorder he could afford and he intended to use it to time shift and to build a library. Wielage writes articles of a technical nature for "Videophile" magazine, a subscription publication for VTR owners.

Wielage has recorded programs from pay television. He has traded tapes with some 25–30 people, most of whom he has contacted through the Videophile magazine. He exchanges "want lists" of films with these people. All of the tapes that Wielage has made or otherwise acquired are for his own personal use, and he watches them either alone or with a few friends.

As a result of some research that he did, Wielage felt uncertain about the propriety of copying copyrighted material, but he did not rely upon anything from the defendants in forming his conclusions. The copyright warning in the Betamax instruction manual did not alter his usage.

The evidence showed that Wielage had recorded off-the-air from some Universal films—*viz.*, "Frankenstein," "Bride of Frankenstein," "Son of Frankenstein," "The Mummy," "Time of Their Lives," "Wolfman," "This Island Earth," "The Mummy's Hand," and "Duck Soup." He copied all of these prior to January 1, 1978. Of the remaining Universal films allegedly copied off the air by Wielage after January 1, 1978, only one, "Saboteur," was actually copied by Wielage. He acquired the others from friends, *viz.*, "Duel," "House of Frankenstein," "House of Fear" and "Horse Feathers."

Wielage copied at least one episode of the New Mickey Mouse Club. He also copied the following cartoons which were contained within six other episodes of the New Mickey Mouse Club: *viz.*, "Firechief," "Mickey's Parrot," "Trick or Treat," "Tortoise and the Hare," "Clock Cleaners," and "The Pointer." There was no evidence that he had recorded "Autograph Hound" as alleged. None of these cartoons bore its own copyright notice when Wielage made the copies. The only Disney film that Wielage copied after January 1, 1978 was an episode of *The Wonderful World of Disney* called "Chip and Dale/Mixed Nuts." Wileage also possessed recordings of the Disney films called "On Vacation With Mickey Mouse and Friends" and "This is Your Life Donald Duck."

### C. Mr. and Mrs. Clinton Bird

Plaintiffs allege that Mr. and Mrs. Bird copied two episodes of a Universal television series entitled "Bionic Woman" and that defendants are liable for this infringement. There is no evidence to support this allegation except two tapes which plaintiffs' attorney said were made by the Birds.

### D. James Lowe

Plaintiffs also allege that the corporate defendants are liable for copying done by Mr. Lowe. Lowe owns a 7200 Betamax and about 170 tapes. Lowe is an attorney who has formed his own opinion that it is legal to record off-the-air. Lowe is also the publisher of the "Videophile." No defendant is involved in the Videophile in any way.

Lowe recorded the Universal film "Psycho" and he intends to erase it. Lowe's son recorded a few 7–8 minute cartoons contained within episodes of the New Mickey Mouse Club and the two of them watched these together when Lowe got home from work. The cartoon titles were: "Donald Applecore," "Pluto's Quinpuplets," "Modern Inventions," "Two Chips and a Miss" and "Donald's Better Self." Lowe's own second recording was a cartoon entitled "Spare the Rod." None of the New Mickey Mouse Club episodes was recorded except for the foregoing cartoons.

Lowe generally views what he has recorded and then erases it. Lowe has erased some cartoons and would have erased the rest of them except that they are in the middle of tapes containing other items.

### E. Geoffrey Soule

Geoffrey Soule owns a 7200 Betamax. He knew about other videotape recorders on the market, but the Betamax was the first he could afford. He could not remember seeing any of defendants' ads before purchasing his Betamax. He bought the Betamax for time shift usage, and this proved to be about 95% of the actual use he made of it. He always had the impression (not gained from Sony) that it was permissible to record off television provided he did not sell what he copied. Soule's general usage of Betamax recordings was to watch once and then erase.

Soule did record the Marx Brothers movies "Horse Feathers," "Coconuts" and "Duck Soup" but he never watched a playback of any one. In fact, he planned to erase the movies because he was not watching them for lack of time and interest, and it was too expensive to keep them.

### SURVEYS OF USAGE

Both plaintiffs and defendants conducted surveys of Betamax owners to ascertain use of the recorder. Field Research Corporation conducted plaintiffs' survey and Crossley Surveys, Inc. conducted defendants' survey. From June 27–July 7, 1978, plaintiffs interviewed by telephone 805 adults who identified themselves as the household member most familiar with the use of the VTR. Of the 805 interviewees, 23 owned a non-Sony VTR. From August 3–24, 1978, defendants interviewed by telephone 998 persons identified as the household member who uses the Betamax most frequently. Both surveys are extensive. Some of their findings are as follows:

* Plaintiffs' survey found that the average number of cassettes owned by the interviewees was 31.73. 63.9% of plaintiffs' interviewees had less than five cassettes with movies on them and 81.1% had less than five cassettes with television programs on them. Defendants' interviewees reported an average of 25.21 cassettes with material recorded off-the-air.

* According to plaintiffs' survey, 75.4% of the VTR owners use their machines to record for time-shifting purposes half or most of the time. Defendants' survey showed that 96% of the Betamax owners had used the machine to record programs they otherwise would have missed.

* When plaintiffs asked interviewees how many cassettes were in their library, 55.8% said there were 10 or fewer. In defendants' survey, of the total programs viewed by interviewees in the past month, 70.4% had been viewed only that one time and for 57.9%, there were no plans for further viewing.

* According to plaintiffs' survey, 58.3% of the owners eliminate commercials from the recording either "sometimes," "rarely," or "never"; 56.1% use the fast-forward to pass commercials either "sometimes," "rarely," or "never."

* Defendants found that 82.4% of the recording done by Betamax owners in the past month was done while they were gone or viewing another channel (and therefore could not use the pause button to eliminate the commercials). 17.6% of the recording was done while viewing, with the pause button being used 8.1% of the time. While viewing playbacks in the past month, defendants' interviewees fast-forwarded through commercials in 24.6% of them.

* Defendants further found that for 89.8% of the interviewees, most of the cassette playback was with family members only. 81.9% of the defendants' interviewees watched the same amount or more of regular television as they did before owning a Betamax. 83.2% reported their frequency of movie going was unaffected by Betamax.

### RECORDING BY RETAIL DEFENDANTS

Plaintiffs hired Paul Ruid, a private investigator, to visit retail stores to observe videotape recorder marketing practices. Plaintiffs' attorneys instructed him to ask for demonstrations.

Ruid visited the Broadway (Carter Hawley) on October 1, 1976 and asked for a demonstration of the Betamax. The salesman showed him a playback of part of an unidentified episode from a Universal series called "Adam 12." It was never determined who had made the recording.

Ruid visited the Broadway again on October 18 at a time when he knew that an old Universal series called "Major Adams" was being telecast. Ruid again asked for a demonstration and this time added a request that "something in the nature of an old movie" be recorded. As he had hoped, a portion of "Major Adams" was recorded.

Ruid visited Associated/Robinson's on October 14, 1976, at a time when he knew that a Universal series called "Gemini Man" was being telecast. He found "Gemini Man" already being shown on television demonstration sets at the store, and he asked for a demonstration of the Betamax. The salesman made two 8-minute recordings of the program, the second to correct what he thought was an error in the first.

Ruid visited Federated/Bullock's on October 14, 1976 at a time when he knew that a Universal mini-series called "Captains and the Kings" was being telecast. He found the television demonstration sets already showing an episode from "Captains and the Kings," and he requested a demonstration of Betamax. In response, the salesman put the Betamax in the record mode. Ruid never saw a playback, and he could not say whether "Captains and the Kings" had been successfully recorded.

Nobody but Ruid ever saw the demonstration playbacks which he had requested and Ruid never saw Betamax demonstrated to anybody else. Ruid did not go to Henry's Camera and request a demonstration. Henry's Camera normally records for about one minute during customer demonstrations at its store.

### HARM TO PLAINTIFF

Plaintiffs admitted that at the time of trial, no existing contract, license or advantageous business relationship of either Universal or Disney had been injured, interfered with or disrupted by the sale or use of Betamax and Betamax tapes or by any other activity of any defendant. This includes without limitation plaintiffs' theatrical, television, 8 or 16 mm, and video-disc products.

In addition, plaintiffs conceded that neither the sale nor the use of Betamax and Betamax tapes had by the time of trial caused Universal or Disney any measurable monetary damage, economic loss or revenue loss. 1978 was a very successful year for both Universal and Disney. It was Disney's eleventh consecutive year of increased profit and the most profitable year in history for Universal Pictures' Theatrical Division.

Universal's television revenues had increased steadily over the three years prior to trial and Disney received its highest television income in 1978.

Plaintiffs did present extensive expert testimony at trial on the issue of prospective harm. Executives of both Universal and Disney testified that in the future Betamax would decrease the value of their copyrights in a number of ways, e. g., by exhausting interest in reruns and by fragmenting the live television audience. These predictions are discussed extensively below. Uniformly, however, these experts were unable to predict at what point in either time or Betamax sales such harm would occur.

*THE BROADCASTING INDUSTRY*

There are 727 commercial television stations in the United States, 516 broadcasting very high frequency ("VHF") signals and 211 broadcasting ultra high frequency ("UHF") signals. These commercial stations are spread out geographically over approximately 235 television "markets."

There are currently three commercial television networks in the United States, each network owning and operating ("O&O") some television stations and having many more stations as "affiliates"—each such station being the network's exclusive outlet in its particular market. Those stations which are not owned by, or affiliated with, a network are called "independents." Each network feeds programming to its affiliates from approximately 7:00 a. m. to 11:00 p. m., with approximately five hours of local programming interspersed in that time period. The network pays the affiliate to broadcast its material. The affiliate can reject the network programming and broadcast local programming if it wishes. The affiliate can also tape the network programming and broadcast it up to seven days at a time when no network programming is being provided.

The commercial networks and stations obtain their revenue primarily from advertisers, who pay to have their commercials telecast. Advertisers buy time (1) on network programming, (2) on a national "spot" basis, and (3) on a local basis—the individual stations receiving the revenue directly on the latter two bases. A typical affiliate station obtains 10% of its revenue from the network and 45% each from national spot and local advertising. The network feed contains commercials but also allows "station breaks or position," wherein the local station may insert national "spot" or local advertising and keep the revenue.

The prevailing "unit" of commercial advertising time is 30 seconds. The rule of thumb is that the larger the perceived rating of the program carrying the commercial, the larger the advertising fee. This fee can run from $45,000 to $125,000 per 30 second commercial for a prime time network slot.

There are also 259 public/educational television stations in the United States, 101 being VHF and 158 being UHF, none of which is commercial network owned or affiliated. Approximately 200 of the public/educational stations are interconnected by a network called the Public Broadcasting Service. Some educational stations are also members of regional networks—i. e., the Eastern Educational Network.

The public/educational stations do not carry advertising and obtain their operating funds from individual and governmental contributions.

The three commercial networks obtain their programming, in part, by virtue of licenses each makes with producers to show the producer's programs. Individual stations, viz., O&O's affiliates and independents, also make such licenses with producers—through syndication. Syndication, as indicated earlier, is generally undertaken only for rerun material—and often is for a kind of exhibition called "stripping," which means running the same series at the same time of day five days a week. Individual stations also create some of their own programming—i. e., commercial stations approximately 16 hours per week and public/educational stations approximately 11 hours per week.

*RATINGS*

The fees which networks and stations pay producers to show their programs, and the

fees which advertisers pay networks and stations to show their commercials (sometimes measured in "cost per thousand," e. g., $5/1000 households) are influenced substantially by the size and demographics of the audience which the programs (and hence the commercials) are expected to reach. For rerun programming, larger audiences obtained during prior showing generally increase the expected audience, and hence the fee, for rerun licensing.

Audience measurement uses several criteria. One size criterion is "ratings"—one rating point is one percent of all homes owning television sets in the relevant market. Nationally, there are approximately 75 million homes owning television, and one national rating point represents 750,000 homes. There is believed to be an average of two individuals viewing television in each home. Another size criterion is "market share"—a percentage figure, indicating what percent of all homes using television ("HUT"), i. e., with television sets turned on in the relevant market at a given time, is tuned to a particular network or station. The criterion of "demographics" is basically a measurement of sex, age, and income bracket of the audience.

Nielsen and Arbitron perform audience measuring services for broadcasters, advertisers, and producers. Nielsen's National Television Index is a ratings service in which a meter attached to each television set in 1200 sample households continuously records what channel the set is tuned to while in use. This meter service does not tell who, if anyone, is watching the set. Ratings measurements are subject to a margin of error of plus or minus 1 to 1½ points. Nielsen's National Audience Composition Service surveys 2400 sample households by providing diaries in which the households keep a record of the viewing actually done by individuals in the household. Diaries are also the source of demographic information. Nielsen also provides a meter service comparable to its national meter service in four local markets. Nielsen's fourth service is the Nielsen Station Index, which uses diaries and reports individually and periodically on some 200 local market areas. These latter diaries, distributed to households four times a year during so-called "sweep periods," cover four weeks each.

The Nielsen meter services already measure videotape recording but do not yet make any measure of playback. At the time of trial, the Nielsen diary surveys made no specific reference to videotape recorder usage, and the only playback information obtained was what people volunteered in the diary.

The Arbitron rating service provides a meter service in three local markets and also a diary service in individual markets in the rest of the country. Arbitron also has sweep periods which are almost the same as Nielsen's. Arbitron was not measuring any videotape recorder usage at the time of trial.

Both Nielsen and Arbitron are capable of obtaining substantially the same kind of information with respect to videotape recorder usage as they presently do with respect to television set usage. Both Nielsen and Arbitron have conducted pilot surveys with videotape recorder owners in order to develop a framework for additional survey work, all leading to the ultimate measurement of videotape recorder usage.

In attempting to maximize ratings and audience shares, networks frequently broadcast their better and stronger programs at the same time—a practice known as "counter-programming." Heightened competition during sweep periods encourages counter-programming.

## LEGAL CONTENTIONS

The above discussion sets forth the factual background for this lawsuit. The fundamental legal premise of this litigation is plaintiffs' contention that the activity of the individual and the retail defendants in recording plaintiffs' copyrighted works off-the-air is copyright infringement. With this basis, they assert that the involvement of Sony, Sonam, DDBI, and the retail stores in the manufacturing, distributing, advertising, and selling of the Betamax makes the defendants liable as direct or contribu-

tory infringers or under the theory of vicarious liability. Finally, building on these assertions, plaintiffs look to the economic arrangements of today's broadcasting industry and foresee irreparable harm to themselves from these allegedly infringing activities. They ask this court for injunctive relief to prevent future infringement.

Plaintiffs' legal argument depends on the basic assumption that the off-the-air recording of their works by defendant William Griffiths and other individuals as well as by the retail defendants constitutes infringement. Because plaintiffs predict the greatest harm from individuals' home-use copying, this court has considered the issue of infringement first with respect to home-use recording and then with respect to the retail defendants' store demonstrations.

### HOME–USE RECORDING

"Home-use" recording as used in this opinion is the operation of the Betamax in a private home to record a program for subsequent home viewing. The programs involved in this lawsuit are broadcast free to the public over public airwaves. The court heard extensive testimony from defendant William Griffiths and four non-defendant individuals about this activity, and the court's declaration of non-infringement is limited to this home use-situation.

It is important to note the limits of this holding. Neither pay nor cable television stations are plaintiffs in this suit and no defendant recorded the signals from either. The court is not ruling on tape swapping, organized or informal. The court is not ruling on tape duplication within the home or outside, by individuals, groups or corporations. Nor is the court ruling on off-the-air recording for use outside the home, e. g., by teachers for classrooms, corporations for employees, etc. No defendant engaged in any of these activities and the facts necessary to determine their legality are not before this court.

The ramifications of this new technology are greater than the boundaries of this lawsuit. A court reviewing the limited claims of specified parties in a particular factual setting cannot and should not undertake the role of a government commission or legislative body exploring and evaluating all the uses and consequences of the videotape recorder.

## I. INFRINGEMENT AND FAIR USE

Recordings made prior to January 1, 1978 are governed by the Old Act (1909) and those made after that date are governed by the New Act (1976). The testimony showed that Marc Wielage had recorded two broadcasts, one Universal and one Disney, after January 1, 1978. All other incidents of copying occurred prior to that date, and these included the recording of five Universal titles by defendant Griffiths; nine Universal and seven Disney by Wielage; two Universal by Soule; one Universal and six Disney by the Lowes; and two Universal by the Birds.

This court finds that this home-use recording is not an infringement under either the Old Act or the New Act. This finding rests on statutory interpretations of both the Old and the New Acts, the legislative history of the New Act, and the doctrine of fair use.

### A. The Old Act

Section I of the Copyright Act, 17 U.S.C. § 1, gave the copyright owner the "exclusive right: (a) To print, reprint, publish, copy, and vend the copyrighted work; . . . ." Under this broad, unqualified language, Betamax recording appears to be an infringing activity. The legislative history does not discuss home-use recording; in 1909, television and its ensuing technology was not even contemplated by Congress.

■ In applying the Old Act, courts created the fair use doctrine to immunize some forms of copying from the literal implications of the statute. The fair use doctrine is discussed extensively below. This court concludes that home-use copying is fair use. This conclusion is based on the doctrine as it was developed by the courts under the Old Act and left unaltered by the New Act. Therefore, this conclusion applies equally to instances of home-use recording under the Old and New Acts.

## B. *The New Act*

 Copyright holders have monopoly power only over those uses of their works that Congress has protected through legislation; their rights do not exist independent of Congressional action. The broad language of the New Act suggests that copyright holders have monopoly power over all reproductions of their works. Legislative history, however, shows that Congress did not intend this broad statement to include reproductions of sound recordings for home use. The central question here is whether Congress intended the same language to give copyright holders of audiovisual works monopoly power over off-the-air recording of their works for home use. Legislative history does not show this intent. On the occasions when the issue was discussed by Congress, all indications were that Congress did not intend to give monopoly power over this use. This legislative history is surveyed below.

Section 106 of the New Act provides:
§ 106. Exclusive rights in copyrighted works

Subject to sections 107 through 118 [17 U.S.C. §§ 107–118], the owner of copyright under this title [17 U.S.C. §§ 101 *et seq.*] has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

Plaintiffs contend that this statutory language is clear. According to them, § 106(1) gives the owner of the copyright an unqualified and exclusive right to "reproduce the copyrighted work in copies or phonorecords." Plaintiffs urge that if Congress had intended to allow home-use copying, it would have made express qualifications as it did in subsections (4) and (5) of § 106.

Defendants respond, and this court agrees, that interpretation of the New Act's language is not that simple. Legislative history must be examined. As the Supreme Court wrote in *Train v. Colorado Public Interest Research Group*, 426 U.S. 1, 9–10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976):

To the extent that the Court of Appeals excluded reference to the legislative history of the FWPCA [Federal Water Pollution Control Act] in discerning its meaning, the court was in error. As we have noted before: "When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *United States v. American Trucking Assn.*, 310 U.S. 534, 543–544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345, 1351 (1940) (footnotes omitted).

The language in § 106 is general and broad. It appears to apply to every situation involving reproduction of a copyrighted work. It does not reflect the specific attention Congress gave to several types of reproduction. As the legislative history shows, Congress did not always draft statutory language to reflect its intent.

In 1955, Congress began revising the Copyright Act of 1909. From 1955 to 1976, the Office of the Register of Copyrights worked with Congress to draft the new legislation and focus issues of concern. Comprehensive revision was a complex and controversial effort. In 1971, the process was impeded by strong disagreement about the treatment of cable television in the revised statutory framework. By the same year, the problem of record piracy had be-

come severe. Relief for this problem was blocked by the dispute over the cable television portions of the revision act. Rather than waiting for complete revision, Congress passed an amendment to the Old Act to deal with sound recording piracy. This amendment became subsection (f) of § 1 of the Old Act and established limited copyright protection for owners of sound recordings. This subsection (f)' was not distinct and separate from the comprehensive revision under way in Congress. Its language was lifted from the earlier general revision bills, and it was incorporated virtually verbatim into § 106 *et seq.* of the New Act. As the Librarian of Congress wrote to the Chairman of the Senate Judiciary Committee on January 19, 1971:

> In general, we also support the amendatory language adopted in the bill which *draws heavily upon the language of the bill for general revision of the copyright law (S. 543)* . . .

> . . . . .

> The most fundamental question raised by the bill is its relationship to the program for general revision of the copyright law. The revision bill before your committee this past session and which Senator McClellan proposes to reintroduce, has parallel provisions, and if general revision were on the threshold of enactment S. 4592 would be unnecessary. However, some fundamental problems impeding the progress of general revision of the copyright law, notably the issue of cable television, have not yet been resolved. We agree that the national and international problem of record piracy is too urgent to await comprehensive action on copyright law revision, and that the amendments proposed in S. 4592 are badly needed now. *Upon enactment of the revision bill, they would, of course, be merged into the larger pattern of the revised statute as a whole.*

S.Rep.No.72, 92d Cong., 1st Sess., 7-8 (1971) (emphasis added).

A comparison of the statutory language shows that the amendment was merged into the New Act. This incorporation is significant because Congress, in passing the legislation, clearly expressed its intent not to restrain home sound recording from broadcasts, tapes or records where the recording is for private, non-commercial use. As the House Report which accompanied the 1971 Amendment stated:

### Home Recording

In approving the creation of a limited copyright in sound recordings it is the intention of the Committee that this limited copyright not grant any broader rights than are accorded to other copyright proprietors under the existing title 17. Specifically, it is not the intention of the Committee to restrain the home recording, from broadcasts or from tapes or records, of recorded performances, where the home recording is for private use and with no purpose of reproducing or otherwise capitalizing commercially on it. This practice is common and unrestrained today, and the record producers and performers would be in no different position from that of the owners of copyright in recorded musical compositions over the past 20 years.

H.Rep.No.487, 92d Cong., 1st Sess. 7, *reprinted in* [1971] U.S.Code Cong. & Admin. News, pp. 1566, 1572.

Thus, while the language of § 106 of the New Act appears to give copyright holders exclusive rights over all recordings, the Congressional intent was that home-use sound recording was not prohibited. Holders of copyrights in sound recordings were not to have any "broader rights than are accorded to other copyright proprietors." U.S.Code Cong. & Admin.News 1971, p. 1572. Defendants contend that, as with home-use sound recording, Congress did not intend to protect copyright holders from off-the-air audiovisual recording for home-use, even though the statute does not expressly so state.

The issue of home-use recording was not addressed in any subsequent House or Senate report. The reports accompanying the 1976 general revision legislation did not restate Congressional refusal to give monopo-

ly power over home-use recording, but the language of the 1971 Amendment was incorporated into the New Act without any suggestion that legislative intent had changed.

The 1971 House Report is not the only support for a finding that the Copyright Act does not prohibit home-use recording. Home-use recording from radio and television broadcasts was discussed in committee hearings, floor debates and reports from the Office of Copyrights. Statements from all three sources are relevant to a determination of legislative intent.[1]

In June, 1971, Subcommittee No. 3 of the House Committee on the Judiciary met in hearings on the sound recording amendment. Representative Beister of Pennsylvania engaged in the following dialogue about off-the-air recording with Ms. Barbara Ringer, then Assistant Register of Copyrights:

MR. BEISTER. I do not know that I can add very much to the questions which you have been asked so far.

I can tell you I must have a small pirate in my own home.

My son has a cassette tape recorder, and as a particular record becomes a hit, he will retrieve it onto his little set.

Now, he may retrieve in addition something else onto his recording, but nonetheless, he does retrieve the basic sound, *and this legislation, of course, would not point to his activities, would it?*

MISS RINGER. I think the answer is clearly, *"No, it would not."*

I have spoken at a couple of seminars on *video cassettes lately, and this question is usually asked: "What about the home recorders?"*

The answer I have given and will give again is that *this is something you cannot control. You simply cannot control it.*

*Hearings on S. 646 before the Subcomm. No. 3 of the House Judiciary Comm.,* 92d Cong., 1st Sess. 22 (June 9 and 10, 1971).

Ms. Ringer proceeded to discuss the problem of unauthorized video recordings finding their way into the market. She recognized that this was a problem which Congress might face in the future but stated that it could not be met by carrying copyright enforcement into the home or by banning devices for off-the-air recording. Her testimony continued:

But *I do not see anybody going into anyone's home and preventing this sort of thing, or forcing legislation that would engineer a piece of equipment not to allow home taping.*

MR. BEISTER: Secondly, *with respect to video cassettes,* are we approaching an additional problem, *not with respect to private use,* but with respect to public distribution after it has been retrieved over a home set?

MISS RINGER: The answer is very definitely, "yes."

For years the motion picture industry has been faced with bootlegging problems, much of it deriving from the 10 mm prints that were distributed to the Armed Forces and got out of control. The film industry has had a very active policing activity for years.

I think that this problem is going to undergo a quantum increase when video cassette recorders are freely available. But I would say that there is a big difference, and I think it is something that you might consider. In that area, they have got copyright protection, and in this area, who knows? *It is certainly not protectable under the Federal statute.*

*Id.* pp. 22–23.

When the 1971 Amendment reached the House floor, the question of noncommercial

---

1. *See Simpson v. United States,* 435 U.S. 6, 13, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978) (statements by committee chairmen and bill sponsors are entitled to great weight); *Zuber v. Allen,* 396 U.S. 168, 192, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969) (departmental construction of its own enabling legislation carries most weight when department administrators participated in drafting and expressed their views to Congress

in committee hearings); *First National Bank of Logan v. Walker Bank & Trust Co.,* 385 U.S. 252, 259–60, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966) (statements of committee members may be considered) and *Ideal Farms, Inc. v. Benson,* 288 F.2d 608, 616 (3d Cir. 1961), *cert. denied,* 372 U.S. 965, 83 S.Ct. 1087, 10 L.Ed.2d 128 (1963) (comments during floor debate by a sponsoring senator may be considered).

home recording was raised by Representative Kazen of Texas and answered by Representative Kastenmeier. Representative Kastenmeier was chairman of the House Judiciary Subcommittee responsible for the New Act, a sponsor of the general revision legislation, and a member of the Conference Committee which put the New Act in final form. The dialogue was as follows:

MR. KAZEN. Am I correct in assuming that the bill protects copyrighted material that *is duplicated for commercial purposes only*?

MR. KASTENMEIER. Yes.

MR. KAZEN. In other words, if your child were to *record off of a program which comes through the air on* the radio or *television, and then used it for her own personal pleasure, for listening pleasure, this would not be included under the penalties of this bill*?

MR. KASTENMEIER. *This is not included in the bill. I am glad the gentleman raises the point.*

On page 7 of the report, under "Home Recordings," Members will note that under the bill the same practice which prevails today is called for; namely, *this is considered both presently and under the proposed law to be fair use. The child does not do this for commercial purposes.* This is made clear in the report.

117 Cong.Rec. 34, 748 (1971).

Treatment of home-use recording is consistent outside the legislative history, as well. Indeed, since 1955, the Copyright Office of the Library of Congress and the Register of Copyright consistently avoided and even opposed efforts to protect copyright owners against home-use recording.

In 1961, the Office issued a report which urged that private performance of a copyrighted film or motion picture not be restrained. The Register contended that statutory damages for such infringement "would be grossly excessive" and that "private performances could rarely be discovered or controlled." The Register directly confronted the issue of home-use videotape recording:

New technical devices will probably make it practical in the future to reproduce televised motion pictures in the home. We do not believe the private use of such a reproduction can or should be precluded by copyright.

*Copyright Law Revision, Report of the Register of Copyrights* (July, 1961), p. 30.

As discussed above, the Copyright Office, through Barbara Ringer, continued to advocate this view throughout the years of legislative revision. The Office was an active participant in drafting, promoting and explaining the legislation for Congress and always maintained that home-use recording is not an infringement.

This position of the Office developed in part from a concern about invasion of the individual's privacy in his home. As Ms. Ringer testified, home recording simply cannot be controlled. Nobody is going into anyone's home to prevent it. The fears of Representatives Beister and Kazen that the legislation would reach their children's activities in their homes were not realized. Of course, not all activity is made legal by virtue of occurring in a private home. Congress can constitutionally legislate against some activity which may occur in the home, but doing so necessarily requires caution. Here, legislative history shows that, in balance, Congress did not find that protection of copyright holders' rights over reproduction of their works was worth the privacy and enforcement problems which restraint of home-use recording would create.

## C. *Fair Use*

■ Analysis of whether home-use recording is an infringement cannot end with the statutory language and legislative history. While the Old Act was in effect, courts devised the doctrine of fair use, which creates a "privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner . . . ." *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 306 (2d Cir. 1966), quoting Ball, *Copyright and Literary Prop-*

*erty* 260 (1966). Fair use has always been a doctrine without rigid definition. "The line which must be drawn between fair use and copyright infringement depends on an examination of the facts in each case. It cannot be determined by resort to any arbitrary rules or fixed criteria." *Meeropol v. Nizer,* 560 F.2d 1061, 1068 (2d Cir. 1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978) (citations omitted).

In this case, new technology has spawned a copyright question of first impression. This court finds that the legislative history of the New Act shows that Congress did not intend to restrain the home-use copying at issue here. Even if this finding were erroneous, the legislative history would be sufficient to raise doubts about the meaning of the statutory language of § 106. This language appears to give copyright holders the exclusive right to reproduce their works in copies or phonorecords. Yet legislative history shows an intent to allow home-use copying of both sound recordings and broadcasted audiovisual material.

In *Twentieth Century Music Corp. v. Aiken, supra,* 422 U.S. at 156, 95 S.Ct. at 2044, the Supreme Court stated that "[w]hen technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of [its] basic purpose." (footnote omitted). The fair use doctrine is a tool for such construction.

The New Act did not change fair use. It did, however, codify the doctrine for the first time and characterize fair use as noninfringement rather than excused infringement. In doing so, both the House and the Senate emphasized that they did not intend to alter the judicial fair use doctrine:

> The statement of the fair use doctrine in section 107 offers some guidance to users in determining when the principles of the doctrine apply. However, the endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in the statute. The bill endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in

the statute, especially during a period of rapid technological change. Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis.

> Section 107 is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way.

H.R.Rep.No.1476, 94th Cong., 2d Sess. 66 (1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 5659, 5680; S.Rep.No.473, 94th Cong., 1st Sess. 62 (1975).

As Congress recognized, the doctrine of fair use must be flexible to deal with technological change. It is an equitable tool for balancing competing claims in copyright cases. The Copyright Act gives copyright owners control of only some uses of their works. *Fortnightly Corp. v. United Artists,* 392 U.S. 390, 393-94, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). The Copyright Act is premised on the belief that the public will benefit when authors are given exclusive rights leading to economic reward and encouragement for continued contribution to the arts and sciences. As H.R.Rep.No.2222, 60th Cong., 2d Sess. 9 (1909), stated about the 1909 Act, copyright is "[n]ot primarily for the benefit of the author, but primarily for the benefit of the public."

The public benefit derived from the copyright scheme, however, depends on careful balancing. If an author's exclusive rights over his work were unlimited, his personal economic incentive could surpass what is necessary for encouragement and actually work against the public by decreasing access to these works. The Supreme Court recognized this balancing in *Twentieth Century Music Corp. v. Aiken, supra,* 422 U.S. at 156, 95 S.Ct. at 2044:

> The immediate effect of our copyright law is to secure a fair return for an "author's" creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good. "The sole interest of the United States and the primary object in

conferring the monopoly," this Court has said, "lie in the general benefits derived by the public from the labors of authors." *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127, 52 S.Ct. 546, 547, 76 L.Ed. 1010. (citations and footnotes omitted).

Other courts, too, have noted the competing goals of the copyright laws. *See, e. g., Williams & Wilkins v. United States*, 487 F.2d 1345, 1352, 203 Ct.Cl. 74 (1973), *aff'd per curiam by an equally divided court*, 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975): " . . . the development of 'fair use' has been influenced by some tension between the direct aim of the copyright privilege to grant the owner a right from which he can reap financial benefit and the more fundamental purpose of the protection 'To Promote the Progress of Science and the useful Arts.' " (citation omitted).

One commentator has suggested that the question of fair use arises where the expectations of the author and the public meet.

[T]he author expects that the copyright scheme itself will sometimes require use of his work necessary in the public interest for which he will not be paid, and society expects that the copyright scheme will either allow such use without reducing the author's incentive or impose no excessive burdens on the public when use is controlled. Put another way, in entrusting their respective interests to the copyright scheme, author and society each takes a risk that the costs to each would not be unacceptable.

L. Seltzer, *Exemptions and Fair Use in Copyright*, at 30 (1978).

▮ The fair use doctrine, as articulated in judicial opinions, is not so concise. The courts have identified four factors for determining fair use. In *Williams & Wilkins, supra*, at 1352, these were identified as "(a) the purpose and character of the use, (b) the nature of the copyrighted work, (c) the amount and substantiality of the material used in relation to the copyrighted work as a whole, and (d) the effect of the use on a copyright owner's potential market for and value of his work." These same four factors were codified almost verbatim in § 107 of the New Act.

§ 107. Limitations on exclusive rights: Fair use

Notwithstanding the provisions of section 106 [17 U.S.C. § 106], the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

This section's language shows that the factors listed are neither exclusive nor required. The factors are illustrative, not definitive. As has been noted, the statute gives no guidance as to the relative weight of the factors and only generally defines the scope of each. 3 *Nimmer on Copyright* § 13.05[A].

Thus, courts are left with great discretion to consider new factors and interpret those codified in new ways. As Congress acknowledged in the House and Senate Reports on the New Act quoted *supra*, such flexibility is necessary in an era of great technological development.

This case invites application of the fair use doctrine to new technology in a new context: off-the-air videotape recording at home for noncommercial home use. While no court has previously addressed this issue, fair use doctrine cases do suggest both an approach and an answer.

The parties' briefing has focused on three cases which illustrate the treatment of fair use in a noncommercial context. Neither these cases nor any others within this court's knowledge, however, discuss copying within a private home using signals beamed over public airwaves.

The three cases addressing fair use in the noncommercial context are *Wihtol v. Crow*, 309 F.2d 777 (8th Cir. 1963); *Williams & Wilkins v. United States, supra*; and *Encyclopaedia Britannica Educational Corp. v. Crooks*, 447 F.Supp. 243 (W.D.N.Y.1978). Their facts must be reviewed.

In *Wihtol*, a church choir director incorporated the entire copyrighted hymn "My God and I" into a new arrangement which was publicly performed by both a high school and a church choir. The Eighth Circuit found the choir director directly liable for infringement and the employer church liable under the doctrine of *respondeat superior*.

In *Encyclopaedia Britannica*, the district court granted a preliminary injunction to plaintiffs, producers of educational audiovisual works, against defendants, local government officials who would tape plaintiffs' works off-the-air, make copies of them and distribute them to the schools. In granting this preliminary relief, the court held that the fair use defense did not overcome plaintiffs' showing of a *prima facie* case. The court first carefully distinguished *Williams & Wilkins*, discussed *infra*, and then held:

> The scope of BOCES' activities is difficult to reconcile with its claim of fair use. This case does not involve an isolated instance of a teacher copying copyrighted material for classroom use but concerns a highly organized and systematic program for reproducing videotapes on a massive scale. BOCES has acquired videotape equipment worth one-half million dollars, uses five to eight full-time personnel to carry out its program, and makes as many as ten thousand tapes per year. For the last twelve years, these tapes have been distributed throughout Erie County to over one hundred separate schools.

> Considering all of these factors, I find that the plaintiffs have established a prima facie case entitling them to preliminary relief. As BOCES points out, the applicability of the defense of fair use raises numerous questions of fact which cannot be resolved without a full trial on the merits. At this stage in the proceedings, I find that the substantiality of the copying and the possible impact on the market for education films tip the balance in favor of the plaintiffs, outweighing BOCES' noncommercial, educational purpose in copying the films.

447 F.Supp. at 252.

In *Williams & Wilkins*, the Court of Claims found that copying by the National Institute of Health ("NIH") and the National Library of Medicine ("NLM") of entire articles published in plaintiff's journals was fair use under the Old Act. The court relied on many factors "and not upon any one, or any combination less than all." 487 F.2d 1345 at 1362. While these factors included elements of the traditional four, the court exercised its discretion to consider other factors it deemed relevant to the issue of fair use in the particular factual context.

The court listed eight factors. First, the court noted that NIH and NLM are nonprofit institutions and that with both the libraries and the requesters, "scientific progress, untainted by any commercial gain from the reproduction, is the hallmark of the whole enterprise of duplication." 487 F.2d at 1354. Second, the court relied on the two-part factor of "a system of limitations" imposed and enforced by the institutions and the "effectiveness of that system to confine the duplication for the personal use of scientific personnel who need the material for their work . . . ." 487 F.2d at 1355. This factor, in the court's view, reduced the significance of the absolute number of copies of an article which must be made. Third, the court found it significant that photocopying had been going on ever since the Copyright Act was adopted with "apparent general acceptance" and asked "whether this marked in-

crease in volume [through improved technology] changes a use which was generally accepted as 'fair' into one which has now become unfair." 487 F.2d at 1356. Fourth, the court was convinced that "medical science would be seriously hurt if such library photocopying were stopped." *Id.* Fifth, the court held that the "record simply does not show a serious adverse impact, either on plaintiff or on medical publishers generally, from the photocopying practices of the type of NIH and NLM." 487 F.2d at 1359. Sixth, the court was reluctant to find infringement because of the "grave uncertainty of the coverage of 'copy' in Section 1 of the 1909 Act . . . ." *Id.* The court noted that "this is now preeminently a problem for Congress . . . ." 487 F.2d at 1360. Seventh, the court reviewed legislative reports for revision of the 1909 Act and found it showed that photocopying can be "fair use" in proper circumstances. 487 F.2d at 1361. Finally, the eighth factor which the court found relevant to fair use was that foreign countries have statutes which allow such photocopying. *Id.* .

The *Williams & Wilkins* case, affirmed by an evenly divided Supreme Court, has little precedential value. Its holding is specifically limited to its unique factual situation. Furthermore, it has been strongly criticized,[2] with the harshest criticism leveled at the Court's treatment of the harm issue (discussed *infra*). The value of the case lies in its demonstration of the relevance of the fair use doctrine when copyright protection is tested by new technology and non-commercial use.

*Wihtol* and *Encyclopaedia Britannica* are also of little precedential value. *Wihtol* involved public performance of the copyrighted material. *Encyclopaedia Britannica* is limited because it was an opinion granting only preliminary relief. The court was not conclusively finding infringement but rather only a *prima facie* case thereof. Even if that court had made a final deter-

mination on infringement, the case nonetheless would be more dissimilar to the situation here than similar. The most important difference is that it did not involve home-use off-the-air recording but rather "a highly organized and systematic program for reproducing videotapes on a massive scale." 447 F.Supp. at 252.

A comparison of the factual settings in the decided cases with that of the present case reveals two distinguishing factors:

(1) Home-use recording is done by individuals or families in the privacy of their own home for use in their home.

(2) The material copied has been voluntarily sold by the authors for broadcast over the public airwaves to private homes free of charge.

These distinctions narrow the issue before this court. They shape the four factors of the traditional fair use analysis and guide the court in defining appropriate expectations of the copyright holder and the public.

■ As discussed above, the traditional four factors in determining fair use are listed in § 107 without reference to weight or priority. Several commentators, however, have suggested that fair use cases show that the fourth factor of harm to the copyrighted work is or should be considered first when determining fair use,[3] and the issue of harm has received the most emphasis in this lawsuit. For these reasons, it is discussed first in this analysis of fair use.

*1. Harm*

The Court of Claims in *Williams & Wilkins* found that library photocopying was fair use because ". . . plaintiff has failed to prove its assumption of economic detriment, in the past or potentially for the future. . . . This record simply does not show a serious adverse impact, either on plaintiff or on the owner's potential market for the work. 487 F.2d at 1359. This approach by the Court of Claims has been

2. *See, e. g.,* 3 *Nimmer on Copyright* § 13.05[E].

3. *See, e. g.,* 3 *Nimmer on Copyright* § 13.-05[A][4]; Seltzer, *Exemptions and Fair Use,*

*supra,* at 36; Freid, *Fair Use and the New Act,* 22 N.Y.L.S. Rev. 497 (1976-1977); and Comment, *Betamax and Infringement of Television Copyright,* 1977 Duke L.J. 1181, 1209.

widely criticized as inappropriate for determining fair use. One of the most forceful criticisms is from Professor Melville Nimmer, who writes that the court confused the issue of harm for purposes of damages with the harm concept in fair use. According to Nimmer, the court should have asked "not whether the particular photocopying activities of the defendant resulted in damages to the plaintiff, but rather whether wholesale photocopying of plaintiffs' journals by any and all libraries and similar institutions would decimate the plaintiffs' potential market." Nimmer, *Photocopying and Record Piracy: Of Dred Scott and Alice in Wonderland,* 22 U.C.L.A. L. Rev. 1052, 1054 (1975).

As in *Williams & Wilkins, supra,* the issue of harm is important in this lawsuit for three determinations: (1) whether the use is fair use, (2) whether an injunction is appropriate, and, (3) assuming infringement, what the damages are. Actual harm may not be essential to any of these three determinations. Without it however, the determinations are much more difficult. It has been suggested that for purposes of fair use, the question should not be what are the past effects but rather what are the probable effects. Freid, *Fair Use and the New Act, supra,* at 505 n. 39. As to the injunction issue, the question is whether any irreparable harm will occur if an injunction is not issued. As will be discussed, this prognostication of irreparable injury is particularly difficult for a court to make when no harm has occurred to date and predictions of future harm are based on personal belief and speculation. The only issue where actual harm is neither necessary nor particularly helpful is the issue of damages. Under both the Old and the New Acts, once infringement is found, statutory damages can be awarded when no actual damages have been proven.

Plaintiffs have admitted that no actual harm to their copyrights has occurred to date. Plaintiffs' experts also admitted that they knew neither the year in which the predicted harm would occur nor the number of Betamax purchases which would cause the harm. Yet they vigorously maintained throughout trial that harm to their copyrights would not only be a probable effect of Betamax usage, but an imminent effect.

The bases for this contention are discussed extensively below in the context of the injunction issue and will not be repeated here. It should be noted, however, that plaintiffs' argument is more complicated and speculative than was the plaintiff's in *Williams & Wilkins.* In *Williams & Wilkins,* the plaintiff asked the court to predict that if many readers obtained a journal article free of charge from the library, the readers would not subscribe to the journal and the plaintiff would be injured. Here, plaintiffs ask the court to find harm based on many more assumptions. Plaintiffs first assume that a large proportion of the 75 million television households in this country will in the near future own the Betamax machine which today costs approximately $875; then they assume that a significantly large number of these Betamax owners will have both the financial ability and the desire to buy many Betamax tapes (today costing approximately $20 each) to record movies and episodes from TV series, and that they will keep these tapes for repeat viewing over many years. They further assume that a viewer will watch these Betamax playbacks at a time when he would otherwise be watching live television. Plaintiffs also assume that even if the tapes were not kept over a long period of time, Betamax owners will still injure the value of their copyrights by deleting commercials from movies and television series. Furthermore, plaintiffs assume that because the Betamax allows more persons to view the original telecast, fewer persons will be in the rerun audience. As is discussed more fully in Part IV *infra,* some of these assumptions are based on neither fact nor experience, and plaintiffs admit that they are to some extent inconsistent and illogical. They surface from a system of marketing which developed because producers and broadcasters could control the time at which the public views materials beamed to them over public airwaves. The Betamax reduces that control, and plaintiffs predict that harm will result.

Because this prediction of harm is based on so many assumptions and on a system of marketing which is rapidly changing, this court is hesitant to identify "probable effects" of home-use copying. Yet even if this factor of the fair use analysis were determined in plaintiffs' favor, it would not render the use unfair. The other three factors, and other considerations which the court finds relevant, must be balanced with the harm.

 Before proceeding to a discussion of these factors, the court notes that the extent of the harm which plaintiffs ask the court to assume is probable is unclear. Harm which "imperils the existence of a publication" is more destructive of a fair use defense than is harm which would "limit profits." *See* Freid, *Fair Use and the New Act, supra*, at 509 n. 53. Plaintiffs' experts have testified that if Betamax is not enjoined, their profits will decrease, and that for some programs, they may not recoup their production costs. If this happens, plaintiffs warn, they will have to reduce the quality, or at least the production costs, of their audiovisual works. Plaintiffs have not said that they will no longer be able to produce this material. Indeed it would be difficult for these plaintiffs to so contend. Their profits have increased yearly, including the years in which VTR technology was introduced and growing. They exploit their material in many ways other than free television. Networks pay them substantial sums of money for their product before it even reaches the television viewer who copies it. Of course, plaintiffs claim that this copying indirectly reduces the revenue by affecting ratings and advertising. If this is true, plaintiffs have marketing alternatives at hand to recoup some of that predicted loss. They stand ready to make their product available in cassettes and compete with the VTR industry. They have proven resilient to change in market practices arising from other technological inventions, *e. g.*, cable television, pay television.

It is true, however, that copyright holders in the television industry have come to expect substantial financial reward. They are entitled to reap the highest profit they can within the industry. The Betamax and other technological advances will undoubtedly change the industry and introduce new considerations into plaintiffs' marketing considerations.

 Copyright law, however, does not protect authors from change or new considerations in the marketing of their products. As the Supreme Court stated in *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*: "While securing compensation to the holders of copyright was an essential purpose of that Act, freezing existing economic arrangements for doing so was not." 415 U.S. 394, 414 n. 15, 94 S.Ct. 1129, 1140, 39 L.Ed.2d 415 (1974). In any event, any harm which might be possible must be weighed with other fair use factors.

2. *Nature of the Material*

This factor has not been discussed extensively in fair use cases. In *Rosemont Enterprises, Inc., supra*, at 307, the court asked whether the nature was such that "distribution would serve the public interest in the free dissemination of information." In *Williams & Wilkins, supra*, at 1356, the court found that the materials were necessary to the development of medical science. The Senate Report accompanying the New Act, S.Rep.No.473, *supra*, suggests that the use of a news article would be judged differently from the use of a musical composition and that reproduction of material which is usually unavailable would be more justifiable than reproduction of readily available material.

The material at the heart of this lawsuit cannot be categorized as "scientific" or "educational." This court cannot, nor would it desire to, pronounce the "New Mickey Mouse Club" episode which the court viewed at trial to be "mere entertainment," or "educational," or "informational," or "beneficial." As the Supreme Court wrote in *Stanley v. Georgia*, 394 U.S. 557, 566, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969), "The line between the transmission of ideas and

mere entertainment is much too elusive for this Court to draw, if indeed such a line can be drawn at all."

Inability to draw these lines does not leave this court without guidance on this factor, however. The most important aspect of the "nature" of the materials involved here is one that courts examining fair use in other media have not had to confront. This case involves only that copyrighted material which plaintiffs voluntarily choose to have telecast over public airwaves to individual homes free of charge. Plaintiffs are not paid for this material by the viewers. While the audience does not pay directly for the programs, however, this telecast is not a gratuity from the plaintiffs. They are paid for the program by the broadcaster at a rate sometimes below production costs and sometimes above. As the Supreme Court discussed in *Teleprompter, supra*, the payment process distinguishes the copyright owner in the television industry from most others:

> Unlike propagators of other copyrighted material, such as those who sell books, perform live dramatic productions, or project motion pictures to live audiences, holders of copyrights for television programs or their licensees are not paid directly by those who ultimately enjoy the publication of the material—that is, the television viewers—but by advertisers who use the drawing power of the copyrighted material to promote their goods and services. Such advertisers typically pay the broadcasters a fee for each transmission of an advertisement based on an estimate of the expected number and characteristics of the viewers who will watch the program. While, as members of the general public, the viewers indirectly pay for the privilege of viewing copyrighted material through increased prices for the goods and services of the advertisers, they are not involved in a direct economic relationship with the copyright holders or their licensees.

415 U.S. at 411–12, 94 S.Ct. at 1139–40 (footnote omitted).

The direct payment from broadcasters and advertisers has made the "free" offering to the public very profitable for plaintiffs. The opportunity to use the public airwaves allows plaintiffs to disseminate their works more widely than they ever could on their own.

This characteristic of the material is significant because of its interaction with the issue of harm. Because plaintiffs derive their revenues only indirectly from the alleged infringers of their work, the harm resulting from the infringement is more speculative. This has been discussed briefly above and will be addressed more extensively in Part IV.

### 3. *Purpose of Use*

■ Courts have traditionally applied this factor by asking whether the copyrighted material is used for criticism, research or other independent work. *See, e. g., Robert Stigwood Group, Ltd. v. O'Reilly*, 346 F.Supp. 376, 384 (D.Conn.1972), *rev'd on other grounds*, 530 F.2d 1096 (2d Cir. 1976); *Loew's Incorporated v. Columbia Broadcasting System*, 131 F.Supp. 165, 175 (S.D. Cal.1955), *aff'd sub nom., Benny v. Loew's Inc.*, 239 F.2d 532 (9th Cir. 1956), *aff'd by an equally divided court*, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1956). Plaintiffs contend that in this case there is no independent use. Betamax owners use the copy for the same purpose as the original. They add nothing of their own.

While this is true, application of this factor is not so limited. Section 106 of the New Act does not require this line of interpretation. Congress did not require independent use when finding home use sound recording to be fair use.

The salient characteristics of the use here are that it is noncommercial and in the home. Plaintiffs correctly point out that noncommercial use does not mean fair use. This is true, just as commercial use does not automatically bar fair use. *Meeropol v. Nizer, supra*, at 1069; *Rosemont Enterprises, Inc. v. Random House, Inc., supra*, at 307. The noncommercial nature of the use here, however, does broaden the scope of

the doctrine. *Loew's Incorporated v. Columbia Broadcasting System, supra*, 131 F.Supp. at 175.

Here, the use is not only noncommercial but also private. This lawsuit concerns individuals in their homes copying material to view at a later time in their homes. At issue is not whether they can take the copy to the church or school and show it to a larger group. What this court rules on is home noncommercial use.

The purpose of this use is to increase access to the material plaintiffs choose to broadcast. This increase in access is consistent with the First Amendment policy of providing the fullest possible access to information through the public airwaves. *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 102, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). This access is not just a matter of convenience, as plaintiffs have suggested. Access has been limited not simply by inconvenience but by the basic need to work. Access to the better program has also been limited by the competitive practice of counterprogramming.

Betamax owners use plaintiffs' works noncommercially and privately. This use increases the owners' access to material voluntarily broadcast to them free of charge over public airwaves. Because the use occurs within private homes, enforcement of a prohibition would be highly intrusive and practically impossible. Such intrusion is particularly unwarranted when plaintiffs themselves choose to beam their programs into these homes.

### 4. *Substantiality*

The fourth traditional fair use factor is the "substantiality" of the use. Generally,

the more substantial the taking from the copyrighted work, the less likely it is that the fair use defense will be available. Like the other variables in the fair use analysis, the substantiality factor is inextricably bound with the issue of harm. Obviously, in the normal case of copying, the effect that the infringing copy has on the market for the original will depend to a large extent on whether the copy can substitute for the original. As Professor Nimmer has written:

> [I]ncorporating substantially all of a short story in what purports to be a literary criticism of the story will serve to fulfill the needs of those who wish to read the story as well as those who merely wish to study the reviewer's criticism. The same result is not as clear, but arguably pertains in the *Gaslight* case [*Benny v. Loew's, Inc., supra*, discussed *infra*.] That is, those who saw the Jack Benny burlesque not only enjoyed his parody, but also became rather fully familiar with the serious underlying story so that they might not thereafter wish to see the plaintiff's original work.

3 *Nimmer on Copyright* § 13.05[D].

 Home use recording off-the-air usually involves copying the entire work. This fact, however, does not defeat the defense of fair use, because all factors must be taken together.[4] When considered with the nature of the material and the noncommercial private use, this taking of the whole still constitutes fair use, because there is no accompanying reduction in the market for "plaintiff's original work."

Plaintiffs contend that the fair use defense is barred in this case by the substantiality factor. They rely on *Walt Disney*

4. As one commentator has concluded:

> Too rigid an application of the substantiality criterion . . . would severely limit dissemination of copyrighted works by new technologies. . . . Indeed, to aid research and education, certain applications of these technologies have been statutorily recognized as fair use. [*See* 17 U.S.C. § 108(a)]. Note, *Home Videorecording: Fair Use or Infringement?*, 52 S.Calif.L.Rev. 573, 608 (1979) (citations omitted).

> Of course, the spread of new technologies poses significant risks for copyright owners, and wholesale reproduction will, in many instances, limit the market for the original work. 3 *Nimmer on Copyright* § 13.05[E]. When that is the case, substantiality of the taking will combine with harm to preclude a fair use defense.

*Productions v. Air Pirates*, 581 F.2d 751 (9th Cir. 1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979), where the court found that the defendants' admitted copying of Disney cartoon characters for use in adult comic books constituted infringement, and on *Meeropol v. Nizer*, 560 F.2d 1061, 1070 (2d Cir. 1977); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 310 (2d Cir. 1966); and *Benny v. Loew's Inc., supra.* It is true that, taken out of context, dicta in *Meeropol* and *Rosemont* appear to preclude resort to a fair use defense when copying is nearly verbatim, but the context of the dicta reveals that the Second Circuit was concerned about substantiality only when it produced harm to the complaining party.

The *Air Pirates* case was a parody case and discussed fair use standards for parodies which, "like the standards for applying fair use in other contexts, have been a source of considerable attention and dispute." 581 F.2d at 756. Specifically, the court reviewed the substantiality test used in *Benny v. Loew's Inc., supra*, another parody case in which Jack Benny's television parody of Metro-Goldwyn-Mayer's "Gas Light" was held to be an infringement. The court interpreted the *Benny* case as establishing a threshold substantiality test for the fair use defense in a parody case, then applied this threshold test to the parody before them and affirmed the dis-

trict court's summary judgment of infringement.[5]

In addition to *Benny*, the *Air Pirates* court cites *Walt Disney Productions v. Mature Pictures Corp.*, 389 F.Supp. 1397 (S.D. N.Y.1975), and *Berlin v. E. C. Publications*, 329 F.2d 541 (2d Cir.), cert. denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964), as support for the threshold substantiality test. Both of these are parody cases. The court also cites *Leon v. Pacific Telephone & Telegraph Co.*, 91 F.2d 484 (9th Cir. 1937). *Leon* was not a parody case, but it discussed the substantiality issue only as to copying *and publication* of copyrighted material:

It is not necessary in the case before us to discuss generally the question of what constitutes "fair use." Obviously, every publication copyrighted admits of many uses which do not constitute infringement. Counsel have not disclosed a single authority, nor have we been able to find one, which lends any support to the proposition that wholesale copying and publication of copyrighted material can ever be fair use.

91 F.2d at 486.

The present proceeding is not a parody case, and, since there has been no distribution, there has been no publication. 17 U.S.C. § 101. The underlying rationale for the threshold substantiality test as dis-

---

**5.** The court observed:

The language in *Benny* concerning the substantiality of copying can be given a reading much more in keeping with the context of that case and the established principles at the time of that case if the opinion is understood as setting a threshold that eliminates from the fair use defense copying that is virtually complete or almost verbatim. *Accord*, 2 *Nimmer on Copyright* § 145. It was an established principle at the time of *Benny* that such verbatim copying precluded resort to the fair use defense. *See, e. g., Leon v. Pacific Telephone & Telegraph Co.*, 91 F.2d 484 (9th Cir. 1937).

*Walt Disney v. Air Pirates, supra*, at 756 (footnote omitted). (*Leon*, as noted *infra* in the text of this opinion, is distinguishable from the case before this court because it involved commercial distribution of the infringing materials.)

The *Air Pirates* court concluded its discussion of the substantiality factor as follows:

Thus *Benny* should stand only as a threshold test that eliminates near-verbatim copying. In the absence of near-verbatim copying, other courts have analyzed the substantiality of copying by a parodist by asking whether the parodist has appropriated a greater amount of the original work than is necessary to "recall or conjure up" the object of his satire. *Berlin v. E. C. Publications, Inc.*, 329 F.2d 541 (2d Cir. 1964), certiorari denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33; see *Columbia Pictures Corp. v. National Broadcasting Co.*, 137 F.Supp. 348 (S.D.Cal. 1955).[13]

[13] In so construing *Benny*, we necessarily disagree with its dictum that a parody is treated no differently than any other taking. See *Berlin v. E. C. Publications, Inc.*, 329 F.2d 541 (2d Cir. 1964), certiorari denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33.

*Walt Disney v. Air Pirates, supra*, at 757; 757 n. 13.

cussed in the above cases is, therefore, not applicable here. The issue before this court is not what degree of copying is necessary to "recall or conjure up" the object of a satire as it was in *Air Pirates*. Nor is the issue whether "wholesale copying and publication" is one of the "many uses [of copyrighted works] which do not constitute infringement." *Leon, supra*, 91 F.2d at 486.

Section 107 of the New Act states that in determining whether the use made of a work in any particular case is a fair use, the factors considered shall include the traditional four. Substantiality is simply listed as one of these factors; it is given no special position in relation to the others. In codifying the fair use doctrine, Congress recognized that there are no simple rules which can be applied as to all cases. As H.Rep.No.1476, *supra*, at 5679, stated:

> Indeed, since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts.

In the unique factual context of this case, the guidance offered in § 107 is followed: all four factors are considered, as well as other criteria relevant to balancing the equities between the parties, and no element is given preclusive effect.

### 5. *Additional Considerations*

This case, which arises from a new technology, is one of first impression. No earlier copyright case addresses the issues raised here. The traditional four factors have not been applied to this type of fact situation.

Congress expressly left the fair use doctrine flexible because it recognized the possibility of such a situation. The doctrine is particularly useful in evaluating new technology and its effect on copyright law. As the House and Senate Reports quoted above note, the doctrine is especially important "during a period of rapid technological change," and "the courts must be free to adapt the doctrine to particular situations on a case by case basis."

 Accordingly, this court finds that the home-use copying made possible by this new technology constitutes fair use of plaintiffs' works. The use, limited to home recording and playback of audiovisual material broadcast free of charge to Betamax owners over public airwaves, is noncommercial and does not reduce the market for plaintiffs' works.

### II. *RECORDING BY RETAIL DEFENDANTS*

The central focus of this lawsuit has been home-use recording. Plaintiffs also contend, however, that retail stores infringe copyrights (1) when they record segments of plaintiffs' shows off-the-air, and (2) when they play these recordings back for the purpose of demonstrating the Betamax to potential purchasers. Specifically, plaintiffs allege that defendants Carter Hawley, Federated/Bullock's, Associated/Robinson's and Henry's Camera have infringed certain copyrights.

The facts supporting these allegations are weak. As discussed *supra*, all copying by the retail defendants was made at the request of Paul Ruid, a private investigator retained by plaintiffs' law firm. While Ruid did not request a specific program for taping or a specific length of recording, he did pose as a potential customer and request a demonstration of Betamax capabilities. At best the evidence shows that in response to this request, Broadway copied an 8-minute segment of "Adam 12" (Universal) and a 15-minute segment of a "Major Adams" (Universal) episode, and that Associated/Robinson's made two 8-minute recordings of the "Gemini Man" (Universal). It was not established at trial that Bullock's had succeeded in making any recording (Ruid never saw a playback of the alleged recording from "Captains and the Kings") and there was no testimony about recording by Henry's Camera.

The retail stores defend their actions on two grounds: (1) any infringement which may have occurred was induced and encouraged by plaintiffs, and, therefore, principles of equity bar suit on these actions; and (2) such copying is fair use.

Plaintiffs' claims against retail stores for their demonstrations are novel. There is no precedent for suing retail stores for displaying public televisions tuned to copyrighted programs, and plaintiffs do not complain here about this aspect of the retail defendants' activity.

■ Without deciding whether Ruid sufficiently "encouraged" activity so as to bar this suit, this court finds there has been no infringement. The retail stores' use of plaintiff Universal's product as presented in this suit is fair use.

Universal admits that no harm has resulted from the retail defendants' copying and playback of Universal products. Furthermore, Universal does not predict any future harm from the copying itself. The underlying concern is not about the copying by the stores but rather about the sales of Betamax. Universal sues the retail defendants because it believes that the stores are liable for contributory infringement by virtue of the subsequent sale of the machine. As Sidney Sheinberg, president and chief operating officer of MCA, testified, Universal would not bring the retail defendants into court to challenge the demonstration copying if there were no sales.

Demonstration copying and playback do not compete in any way with plaintiffs' products. The stores do not record and play back entire shows. The testimony does not show any librarying by the retail stores or any intent to use or profit from the copyrighted works. The only intent is to demonstrate the machine. For these reasons, the court finds that the demonstration copying of these retail defendants is fair use.

This cause of action against the retail stores is without precedent. There has been no suit to challenge photocopying to demonstrate a photocopier; playing a record to demonstrate a stereo system; or recording off a radio to demonstrate a recorder. The only damage claimed by Universal is that the demonstrations give an "imprimatur of acceptance" to copying off-the-air. As already discussed, this court finds that home-use copying is acceptable.

In any event, this imprimatur is insufficient to render the retail defendants' demonstration use unfair.

Plaintiffs' claim that the sale of the machines constitutes contributory infringement is discussed below.

### III. *LIABILITY OF THE CORPORATE DEFENDANTS*

■ Even if this court were to hold that home-use copying is an infringement under the Old and New Acts and is not fair use, the court could not find defendants Sonam, Sony, DDBI and the retail stores liable for this infringement. Plaintiffs contend that these defendants are liable under any of three theories: (a) direct infringement, (b) contributory infringement and (c) vicarious liability. This court cannot find any of the corporate defendants liable on any of these theories.

#### A. *Direct Infringement*

Plaintiffs contend that Sony and Sonam are liable as direct infringers for the copying done by Betamax owners because they furnished the instrumentality for the allegedly infringing activity and they knew and expected that the major use of Betamax would be to record copyrighted material off-the-air, including motion pictures owned by Universal and Disney. To support this contention, plaintiffs cite deposition testimony from Sonam executives and DDBI memos and advertisements which plaintiffs claim show expectation and encouragement of the recording of copyrighted material. Plaintiffs emphasize that DDBI knew of this potential copyright infringement and successfully sought from Sony an indemnity agreement.

To support a finding of direct infringement from this evidence, plaintiffs cite *Kalem Co. v. Harper Brothers*, 222 U.S. 55, 32 S.Ct. 20, 56 L.Ed. 92 (1911); *Elektra Records Co. v. Gem Electronic Distributors, Inc.*, 360 F.Supp. 821 (E.D.N.Y.1973) and *Universal Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354 (9th Cir. 1947). While the lines between direct infringement, con-

tributory infringement and vicarious liability are not clearly drawn, it appears from the courts' discussions of direct infringement in these three cases that plaintiffs' evidence here does not prove direct infringement. The involvement of the defendants in the infringing activity discussed in these cases was much more substantial and direct than that alleged against defendants here.

It is true that one can be found to have infringed directly even without participating in the actual infringing activity. In *Kalem*, a film producer was found liable for infringement through public exhibition of a film even though third persons had actually exhibited the film. There, however, the defendant-producer had not only advertised that the film could be used for public exhibition but had actually produced the infringing film, which contained scenes from the book "Ben Hur." The court found that public exhibition of this film infringed the book's copyright, and the film producer was held liable.

*Elektra*, the most recent case relied on by plaintiffs, is completely distinguishable. Not only did it not involve home use recording, but it expressly distinguished such recording. Defendants operated a store where they (1) sold blank tapes; (2) maintained on their premises a coin-operated machine ("Make-A-Tape") which could duplicate onto blank tapes from prerecorded tapes; and (3) loaned purchasers of blank tapes prerecorded copyrighted works for duplication on the Make-A-Tape machine. There was even some suggestion at trial that the defendants directly assisted in the duplication.

The court found that defendants' Make-A-Tape operation "clearly evidences their commercial exploitation . . . for profit in derogation of plaintiffs' rights of exclusive publication." 360 F.Supp. at 823 (footnote omitted).

One of the defenses in *Elektra* was that the "individual and self-service nature" of Make-A-Tape duplication made it analogous to home recording for home use. The court expressly rejected this argument:

That exception [home recording] does not cover situations where the copying is done for the "purpose of reproducing or otherwise capitalizing commercially on it." House Report No. 92–487, U.S.Code Cong. & Admin.News, *supra* at p. 1572. The facts of record here bespeak commercial exploitation and nothing else. In lending the copyrighted sound recording to the customer without charge, in selling the less costly blank tape from which the spurious but exact copy may be made, and in providing the equipment whereby it may be speedily done at minimal cost, defendants are engaging in mass piracy on a custom basis. To view this activity as a form of "home recording" would stretch imagination to the snapping point. To refuse to protect plaintiffs' exclusive reproduction and publication rights in such circumstances would defeat the very purpose of the sound recording amendment and nullify the intent of Congress. 360 F.Supp. at 824–25.

This statement by the *Elektra* court highlights why the case has little precedential value for this decision. Defendants Sony and Sonam manufacture and market the Betamax and blank tapes. They do not, however, loan or otherwise provide the copyrighted work. Rather, copyright owners sell their works for broadcast to the public free of charge over public airwaves. The copying occurs not in a store operated and managed by the defendants but rather in a person's home, a location in which individual privacy is constitutionally protected and over which defendants have no control. Furthermore, defendants' acts of selling the Betamax and blank tapes to consumers can easily lead to noninfringing uses. In *Elektra,* the intent to infringe was clear: the prerecorded tapes were momentarily loaned to purchasers of blank tapes specifically for use in the store on the Make-A-Tape machine.

The videotape recorder, like a tape recorder, is a staple item of commerce. Its uses are varied. As Justice Holmes recognized in *Kalem*, "[i]n some cases where an ordinary article of commerce is sold nice

questions may arise as to the point at which the seller becomes an accomplice in a subsequent illegal use by the buyer." 222 U.S. at 62, 32 S.Ct. at 21. Nice questions do arise here. Defendants have provided the public with a machine capable of recording off-the-air. In *Kalem,* manufacturers of the film and the camera used to make the infringing dramatization of "Ben Hur" were not sued; nor was the manufacturer of the Make-A-Tape machine in *Elektra.* There is no precedent for finding the corporate defendants here liable for direct infringement.

The *Harold Lloyd* case relied on by plaintiffs primarily discusses contributory infringement, not direct infringement, and is addressed below.

### B. *Contributory Infringement*

The Second Circuit has offered the most clear definition of contributory infringement:

> [O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a "contributory" infringer.

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,* 443 F.2d 1159, 1162 (2d Cir. 1971) (footnote omitted).

Plaintiffs rely on the same factual allegations discussed above to support a finding of contributory infringement: the manufacture, advertising, demonstration and sale of Betamax causes, induces or, at the very least, encourages, furthers or materially contributes to the unauthorized recording of copyrighted motion pictures. According to plaintiffs, that is the primary use for which Betamax is designed and marketed and which defendants encourage in their ads and brochures. In addition, plaintiffs' witnesses testified at trial that while off-the-air recording was possible with machines available prior to Betamax, Betamax was the first compact, affordable consumer item.

In rebutting allegations of contributory infringement, defendants repeat their argument that a manufacturer of a staple article of commerce cannot be held liable for infringement by purchasers of that product. As to the advertising, defendants correctly note that there was no evidence at trial that any advertisements or other statements by defendants in any way induced or caused to be made any of the copies at issue. As to the retail defendants, Henry's Camera was the only one that sold a Betamax to any of the owners discussed in this suit. Henry's Camera sold a 7200 to William Griffith's sons. Griffith testified, however, that he never talked to anyone at Henry's Camera about the Betamax in any respect.

Defendants further contend that the essential element of "knowledge of the infringing activity" is missing. Plaintiffs assert that, while defendants may not have known that specific titles were being copied or that this would be illegal, they did know that the main use of the Betamax would be to record copyrighted works off-the-air and that such recording is a copyright infringement. Plaintiffs cite deposition testimony of Sony executives to support this finding of knowledge. Defendants respond that the opinions expressed in these depositions were ones held prior to 1975. These opinions changed and Sony did not place a warning plate on the back of the Betamax as it had done with earlier VTRs and did not include a warning in Betamax advertisements. Furthermore, they cite the 1977 opinion of this court that "to say that use either is or is not illegal is simply not yet true." *Universal City Studios v. Sony Corp. of America,* 429 F.Supp. 407, 410 (C.D.Cal. 1977).

This court agrees with defendants that their knowledge was insufficient to make them contributory infringers. In the contributory infringement cases cited by plaintiffs, the requisite knowledge is greater than that possessed by the corporate defendants here.

In the *Gershwin* case, *supra,* the court found a concert artists' managing company to be a contributory infringer because the management company knew that the artists were performing copyrighted works and

**460**

would not secure a copyright license, and yet it helped to form and direct an artists' association and create an audience for them.

In discussing contributory infringement, the *Gershwin* court cited *Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.,* 256 F.Supp. 399 (S.D.N.Y.1966) ("Screen Gems I"). There the court focused on the manufacture and sale of records which reproduced musical compositions without compliance with the statutory compulsory license provision. Plaintiffs—owners of the infringed copyrights—sued (1) the advertising agency which created ads for the records and purchased time from a radio station; (2) the owner and operator of the radio station; and (3) the agency which packaged and mailed the records. These defendants moved for summary judgment. The court denied this motion, finding that there were issues of fact as to whether each had either actual or constructive knowledge of the infringement and, if so, whether each could be "held liable as one who knowingly participated in or furthered the tortious conduct." 256 F.Supp. at 404 (footnote omitted).

Two of the defendants—the radio station and the packager—subsequently settled. The advertising agency went to trial. The court found that the work performed for the infringer by the advertising agency was "a participation in and a furtherance of their infringement of plaintiffs' copyrights" and then focused on whether the agency had engaged in this work with the knowledge that its clients were infringers. 327 F.Supp. 788, 791 (S.D.N.Y.1971) ("Screen Gems II"). The court found that the agency employee who handled the account was "a knowing party to the piracy. His knowledge binds his employer." 327 F.Supp. at 792.

In *Universal Pictures Co. v. Harold Lloyd Corp., supra,* the writer for an infringing motion picture photoplay was found to be a contributory infringer because he had selected the material for the photoplay knowing that it had been used in another picture.

Here, no employee of Sony, Sonam or DDBI had either direct involvement with the allegedly infringing activity or direct contact with purchasers of Betamax who recorded copyrighted works off-the-air. Henry's Camera sold the Betamax to Griffiths' sons, but no testimony shows that the store or its employees knew that Griffiths would record copyrighted works.

Plaintiffs assert, however, that these defendants knew it was likely that people would use the Betamax to record copyrighted works and that this constitutes constructive knowledge. Even assuming that such probability were both accurate and sufficient to create "constructive knowledge" of the recording of copyrighted works, these defendants could not know that this was an infringing activity. Unlike the management agency which knew that the artists would not get a copyright license or the advertising agency whose employee knew that records were being made without paying a compulsory license fee, defendants here could not know what copyright law required. Before this lawsuit, that issue had not been determined. As discussed above, this court finds that home use recording is not an infringement. Even if this finding were incorrect, defendants could not be held responsible for knowing otherwise.

It is also doubtful that these defendants have met the other requirement for contributory infringement: inducement or material contribution to the infringing activity. Plaintiffs contend that Sony, Sonam, DDBI and Henry's Camera through advertising "induced" the infringing activities of recording copyrighted shows and librarying. As discussed above, Sony (through DDBI) and Henry's Camera did advertise the use of Betamax for recording favorite shows and compiling a library. Once again, however, there was no evidence that any of the copies made by Griffiths or the other individual witnesses in this suit were influenced or encouraged by these advertisements.

Plaintiffs' claims are unprecedented. Unlike the defendant in *Gershwin,* defendants here do not arrange for and direct the

programming for the infringing activity. Unlike the defendants in *Screen Gems I* and *II,* defendants here do not sell or advertise the infringing work. Plaintiffs sue defendants because they manufacture, distribute, advertise and sell a product capable of a variety of uses, some of them allegedly infringing.

Selling a staple article of commerce—*e. g.,* a typewriter, a recorder, a camera, a photocopying machine—technically contributes to any infringing use subsequently made thereof, but this kind of "contribution," if deemed sufficient as a basis for liability, would expand the theory beyond precedent and arguably beyond judicial management.

In patent law, manufacturers, distributors, retailers and advertisers of staple articles of commerce suitable for substantial noninfringing use cannot be held liable as contributory infringers. *See* 35 U.S.C. § 271(c); *Aro Manufacturing Co. v. Convertible Top Co.,* 377 U.S. 476, 488–89, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964); *Henry v. A. B. Dick Co.,* 224 U.S. 1, 48, 32 S.Ct. 364, 56 L.Ed. 645 (1912). As the Court in *Henry* noted, to hold otherwise would "block the wheels of commerce." *Id.*

Whether or not patent law has precedential value for copyright law and the Betamax is capable of "substantial" noninfringing use, the underlying rationale for the patent rule is significant. Commerce would indeed be hampered if manufacturers of staple items were held liable as contributory infringers whenever they "constructively" knew that some purchasers on some occasions would use their product for a purpose which a court later deemed, as a matter of first impression, to be an infringement.

### C. *Vicarious Liability*

*Screen Gems I, supra,* and *Gershwin* discussed vicarious liability as well as contributory infringement. As the *Gershwin* court noted, the roots of vicarious liability lie in the doctrine of *respondeat superior*: an employer is liable for the actions of his agent. Vicarious liability for copyright in-

fringement is not dependent on an employer-employee relationship. Vicarious liability can be imposed when a party has the "right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Gershwin,* 443 F.2d at 1162. *Accord, Screen Gems I,* 256 F.Supp. at 402. Here defendants have neither the right nor the ability to control Betamax purchasers' use of the machines in their homes, and any financial benefit is derived from use of the machine whether or not this use is infringing.

In *Gershwin,* the court found that while the management company had no formal power to police the artists' association, it participated pervasively in the direction of the association and its programming, and the association depended on it for direction "in matters such as this." 443 F.2d at 1163. With these facts, the court found that the management company was in a position to police the artists.

In *Shapiro, Bernstein & Co. v. H. L. Green Co.,* 316 F.2d 304 (2d Cir. 1963), the court never used the term "vicarious liability" but did discuss *respondeat superior* in the context of copyright infringement. Drawing an analogy to cases where a dance hall's management was found liable for infringing music performed by the bands it hired, the court found that a chain store owner was liable for the sale of infringing record albums by a concessionaire within its store. There the store owner retained the ultimate right of supervision over the record concession and took a proportionate share of the sale of the infringing records.

In *Chess Music, Inc. v. Sipe,* 442 F.Supp. 1184 (D.Minn.1977), a tavern owner was found vicariously liable for the infringing performances of the live bands he hired. The court held that the owner "is deemed to have acquiesced in the musicians' performance as he allowed the musicians the discretion to select the performance." 442 F.Supp. at 1185.

Plaintiffs contend that defendants have similar power to supervise home recording of copyrighted works. They suggest that

defendants could develop a jamming system to prevent recording of anything copyrighted. Whether or not such jamming is technologically feasible, this "supervision" would not be within the power of these defendants. A jamming system would most likely require the cooperation of many others: broadcasters, producers and perhaps the Federal Communications Commission.

Plaintiffs also assert that defendants could remove the tuner from the Betamax and thereby make it impossible to record off-the-air. Even if defendants were required to do this, however, an outboard tuner could be purchased separately.

The most effective way for defendants to control the recording of copyrighted audiovisual work is to stop selling the Betamax. Plaintiffs, however, have cited no case in which a defendant's "power to supervise" was based on his ability to terminate the business.

The second requirement, financial benefit, may also be absent here. In *Shapiro* and *Screen Gems I* and *II,* the infringing records benefited the defendants directly; they received a share of the revenue from the sales. In *Gershwin,* the management company received a fee for its assistance in programming and arranging the artists' performances. Here, defendants do not profit from the infringing activity directly. They receive financial benefit from the sale of tapes, regardless of their subsequent use. They benefit directly from the allegedly infringing use only if they sell more because that use is available.

Plaintiffs urge expansive interpretations of the vicarious liability requirements. They contend that Sony has power to supervise because it could refuse to sell the Betamax and that Sony benefits financially from the infringement because some persons would not buy the Betamax if they could not record copyrighted works. With these interpretations, plaintiffs expand the doctrine beyond precedent and, potentially, bring many manufacturers, advertisers and retailers into the net of vicarious liability. For example, manufacturers of cameras could supervise infringers by not selling cameras; and they benefit financially from the sale of the camera to the infringers. Manufacturers of photocopying machines could supervise infringers by not selling photocopiers; and they benefit from the sale of the machine to the infringers. Vicarious liability has not been extended so far, and the facts of this case do not merit such an extension.

In addressing the issue of liability for performance of copyrighted works, H.R. Rep.No.1476, *supra,* set the following standard:

> To be held a related or vicarious infringer in the case of performing rights, a defendant must either actively operate or supervise the operation of the place wherein the performances occur, or control the content of the infringing program, and expect commercial gain from the operation and either direct or indirect benefit from the infringing performance.

H.R.Rep.No.1476, *supra,* at 159–60; [1976] U.S.Code Cong. & Admin.News, pp. 5775–76.

While this section of the House Report addresses performances and not copying, it does suggest reasonable limitations for vicarious liability in general and aids this court in interpreting the performance cases (*Gershwin, Chess Music*) on which plaintiffs rely.

Defendants are outside both the scope of these limitations and all previous application of the doctrine of vicarious liability. Their participation in and benefit from home recording of copyrighted works would not be sufficient to make them vicariously liable if this activity, contrary to this court's finding in Part I, were deemed to be an infringement.

## IV. *STATE CAUSES OF ACTION*

█ Plaintiffs contend that if home use copying is an infringement, all corporate defendants are liable for unfair competition and fraudulent business practices in violation of California Civil Code § 3369 and California Business and Professional Code

§ 17500. They maintain that the corporate defendants are liable because (a) their advertising of the Betamax unfairly misleads the public to believe that copying off-the-air is legal, and (b) the Betamax diverts viewers from watching plaintiffs' shows on live television and in movie theaters.

The cases on which plaintiffs rely do not support their cause of action against these defendants. In both *People v. Wahl,* 39 Cal.App.2d Supp. 771, 100 P.2d 550 (1940) and *Chern v. Bank of America,* 15 Cal.3d 866, 127 Cal.Rptr. 110, 544 P.2d 1310 (1976), the defendants misrepresented facts in their dealings with the public. Here, defendants' advertisements, even assuming that they gave the impression of legality, did not misrepresent any fact within the knowledge of the defendants. Before this lawsuit, it was not fact that home-use copying of copyrighted works constituted infringement; of course, as discussed in Part I, it is still not fact.

Plaintiffs' second contention as to unfair competition also fails. By the time of trial, Betamax had caused no measurable decrease in the live television or movie audience for plaintiffs' works and, as discussed in Part IV, the evidence does not show a likelihood of such a decrease.

Plaintiffs also alleged that defendants have intentionally interfered with their contractual and advantageous business relationships with networks and independent television stations. Yet they admit that to date no contract has been breached and no damage has been suffered. The elements for interference with contractual relations have not been proven. *See Charles C. Chapman Building Co. v. California Mart,* 2 Cal.App.3d 846, 853, 82 Cal.Rptr. 830 (1969).

Plaintiffs have also not proven any interference with advantageous business relationships. Once again, they admitted at the time of trial that there had been no measurable loss of profits or damage suffered because of Betamax. "[I]t is essential to a cause of action for unlawful interference with business that it appeared that, except for the tortious interference of the defendant, there was a reasonable probability that plaintiff would have entered into a contract or would have made a profit." *Wilson v. Loew's, Inc.,* 142 Cal.App.2d 183, 192, 298 P.2d 152, 159 (1956).

Defendants contend that these state causes of action are preempted by federal copyright law. Since this court finds that no state cause of action has been proven, there is no ruling on the preemption issue.

## V. INJUNCTIVE RELIEF

Plaintiffs seek injunctive relief. They ask the court to exercise its equitable powers to restrain defendants from manufacturing, distributing, selling or offering for sale Betamax or Betamax tapes; from using Betamax or Betamax tapes to copy motion pictures owned and copyrighted by plaintiffs; from advertising that Betamax and Betamax tapes may be used for the purpose of making copies of television shows, including motion pictures owned and copyrighted by plaintiffs; and from exhibiting or playing all videotape copies made by defendants of motion pictures owned and copyrighted by plaintiffs. Plaintiffs have suggested alternatively that the court require Sony to modify the Betamax to render it incapable of recording copyrighted works off the air.

An injunction is an equitable remedy. Its issuance is a matter of court discretion. As the Court recognized in *Hecht v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944), "We are dealing here with the requirements of equity practice with a background of several hundred years of history. . . . The historic injunctive process was designed to deter, not to punish." 321 U.S. at 329, 64 S.Ct. at 591–92.

There are no rigid rules to instruct courts when to issue injunctions. An injunction is never a matter of absolute right. As the Supreme Court recently stated in *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 193, 98 S.Ct. 2279, 2301, 57 L.Ed.2d 117 (1978):

It is correct, of course, that a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law. . . .

As a general matter it may be said that "[s]ince all or almost all equitable remedies are discretionary, the balancing of equities and hardships is appropriate in almost any case as a guide to the chancellor's discretion." D. Dobbs, Remedies 52 (1975).

An injunction is a harsh and drastic remedy. *Kass v. Arden-Mayfair, Inc.*, 431 F.Supp. 1037 (C.D.Cal.1977). Courts have recognized:

> There is no power the exercise of which is more delicate, which requires greater caution, deliberation and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction . . . . . The right must be clear, the injury impending or threatened, so as to be averted only by the protecting preventive process of injunction: but that will not be awarded in doubtful cases, or new ones, not coming within well established principles for if it issues erroneously, an irreparable injury is inflicted, for which there can be no redress, it being the act of a court, not of the party who prays for it.

*Detroit Newspaper Publishers Association v. Detroit Typographical Union No. 18, International Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972), *quoting* 3 Barron & Holtzoff, *Federal Practice and Procedure* (Wright Ed.) § 1431.

This is a doubtful case. An injunction would deprive the public of a new technology capable of noninfringing uses (see *infra*). Furthermore, the need for an injunction is not clear.

Courts look for irreparable harm to the plaintiff before issuing injunctive relief, and here plaintiffs' fears of irreparable harm are speculative at best. Plaintiffs contend that if the court finds that copyright infringement has occurred, irreparable harm is presumed, and it becomes defendants' burden to prove that further harm will not occur in the future.

The bulk of this opinion has been addressed to this court's reasons for finding that home-use copying does not constitute infringement. Even if the court had concluded otherwise, however, it would not find an injunction appropriate.

It is true that courts have acknowledged that actual harm from copyright infringement is very difficult to prove, and, "in the ordinary case," irreparable harm is presumed when the copyright holder's "right to the exclusive use of the copyrighted material is invaded." *American Metropolitan Enterprises of New York, Inc. v. Warner Brothers Records, Inc.*, 389 F.2d 903, 905 (2d Cir. 1968). Plaintiffs claim that no court has ever refused to grant a permanent injunction in a copyright case when infringement has been proven, even when there has been no evidence of harm. Plaintiffs cite *Chappell & Co. v. Middletown Farmers Market & Auction Co.*, 334 F.2d 303 (3d Cir. 1964) (direct infringer permanently enjoined); *Big Sky Music v. Todd*, 388 F.Supp. 498 (S.D.Ga.1974) (injunction against owner and operator of nightclub for copyright infringement by live bands performing in the club); *Fisher-Price Toys, Division of Quaker Oats Co. v. My-Toy Co., Inc.*, 385 F.Supp. 218 (S.D.N.Y.1974) (direct infringer permanently enjoined); *Shapiro, Bernstein & Co., Inc. v. "Log Cabin Club Association,"* 365 F.Supp. 325, 328 (N.D.W.Va.1973) (injunction against president and manager of association for musical copyright infringements occurring in club operated by association); *Peter Pan Fabrics, Inc. v. Dixon Textile Corp.*, 188 F.Supp. 235, 238 (S.D.N.Y.1960) (direct infringer permanently enjoined); *Adviser's, Inc. v. Wiesen-Hart, Inc.*, 161 F.Supp. 831 (S.D.Ohio 1958) (direct infringer permanently enjoined) and *Gordon v. Weir*, 11 F.Supp. 117, 124 (E.D.Mich.1953), *aff'd*, 216 F.2d 508 (6th Cir. 1954) (direct infringer permanently enjoined).

This litigation, however, is not the "ordinary" copyright case where plaintiffs seek an injunction against the direct infringer or the person who controls the infringing activity. Plaintiffs here ask the court to enjoin the manufacturer, distributors, retailers and advertiser of a machine used by persons in private homes for allegedly infringing activities. There is no precedent for plaintiffs' requested injunction.

No such injunction was granted in the cases cited by plaintiffs. Indeed, this court has found no case in which the manufacturers, distributors, retailers and advertisers of the instrument enabling the infringement were sued by the copyright holders. For example, in *Williams & Wilkins Co. v. United States, supra,* and *Wihtol v. Crow, supra,* plaintiffs did not make the manufacturer or seller of photocopy machines a defendant. In *Encyclopaedia Britannica Educational Corp. v. Crooks, supra,* the infringer was a school district that videotaped copyrighted programs, but the manufacturer of the tape recorders and the tape used in the infringement was not made a defendant. In *Elektra Records Co. v. Gem Electronic Distributors, Inc., supra,* the infringer owned retail stores which installed coin-operated tape recorders (Make-A-Tape) for customer use in duplicating prerecorded copyrighted tapes. The manufacturer of the recorders used in the infringement was not made a defendant. In *Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc., supra,* the infringer (Mark-Fi) was a manufacturer of bootleg phonograph records, but the manufacturer of the record pressing equipment used in the infringement was not made a defendant.

As noted above, an injunction is an equitable remedy. Plaintiffs' request for an injunction against the corporate defendants is unique, and the equitable considerations are different from those found in the typical copyright case. Because the defendant's role in the asserted infringement is indirect, and because defendant's product is also used for purposes where no infringement could be alleged (*e. g.,* recording material which is not copyrighted or where permission to record is given), it is necessary to weigh the evidence of harm offered at trial. The court must consider this evidence in the context of the effect of an injunction in this case.

Plaintiffs predict a wide range of harmful effects from the various uses of Betamax. Some of these effects are immediate; others are delayed. Plaintiffs contend that each will result from one of the following uses of the Betamax machine:

1. Recording material off-the-air but never viewing the copy.

2. Time-Shifting: Recording off-the-air while not viewing the program, watching the copy within a short period of time and erasing it thereafter.

3. Librarying: Recording off-the-air and saving the tape for more than one subsequent viewing.

4. Avoiding commercials either by using the pause button while recording or by fast-forwarding while playing back.

Plaintiffs' prediction of harm from each of these uses assumes that the public will own and use a very large number of Betamax recorders. By the end of 1978, after four years of increasing sales of Betamax and several years of sales of its competitors, plaintiffs had experienced no harm. In addition to admitting that there has been no harm to date, plaintiffs admit they cannot predict at what date or level of sales the expected harms will occur. The growth of Betamax ownership will be affected by price. Today the machine costs approximately $875 with each tape costing approximately $20. The growth of ownership will also be influenced by competition from Universal's prerecorded discs and other prerecorded cassettes.

Each listed use is addressed below with plaintiffs' accompanying prediction of harm and the assumptions underlying that prediction.

### A. Recording But Never Viewing

People may occasionally tape more material than they will watch. For example, defendant Griffiths testified that he recorded "Alpha Caper" but erased it before ever watching it.

Plaintiffs contend that even this recording merits concern as a *per se* violation of the copyright law. They do admit, however, that their copyright is not actually injured by this activity. Without this injury, this court will not issue an injunction against the corporate defendants based on this use.

**466**

## B. *Time-Shifting*

At least two time-shifting situations were discussed at trial. First, a person may be at work at 4:30 p. m. and want to tape a program telecast then for his viewing later that evening. For example, Lowe testified that his son would record Mickey Mouse cartoons in the afternoon for both of them to watch that evening when Lowe returned home from work. Second, during sweep periods when counter-programming is most intense, a Betamax owner may want to record one network's program while watching another. For example, plaintiffs' witnesses testified about "Betamax Sunday," February 18, 1979. On that evening, one network broadcast "Gone With the Wind" against the other network's "One Flew Over the Cuckoo's Nest" against the other network's "Elvis." The public may well have wanted to see all three, but the networks forced a choice. Betamax increases the viewer's access from one to two programs.

Plaintiffs foresee many harms from time-shifting: (1) a decrease in the size of the live audience at the time of telecast; (2) a loss to live television or other plaintiff-sponsored entertainment at the time of viewing the. copy; (3) a loss to the rerun audience; and (4) a loss to theater or film rental exhibition of the same program.

(1) Plaintiffs fear that persons "watching" the original telecast of a program will not be measured in the live audience and ratings and revenues will decrease. There was testimony at trial, however, that Nielsen Ratings has already developed the ability to measure when a Betamax in a sample home is recording the program. Thus, the Betamax owner will be measured as a part of the live audience. The later diary can augment that measurement with information about subsequent viewing.

(2) Plaintiffs predict that live television or movie audiences will decrease as more people watch Betamax tapes as an alternative. Here plaintiffs assume that people will view copies when they would otherwise be watching television or going to the movie theater. There is no factual basis for this assumption. It seems equally likely that Betamax owners will play their tapes when there is nothing on television they wish to see and no movie they want to attend. Defendants' survey does not show any negative effect of Betamax ownership on television viewing or theater attendance.

Plaintiffs rely on the concept that "viewing time is relatively inelastic," that persons will spend only so many hours watching any kind of television. Even if that is true, the time-shifting function may simply rearrange these hours. Instead of watching two hours each night of the week, the viewer may go bowling while recording his favorite Monday night program and watch it in addition to his regular two hours on Saturday.

Furthermore, this court cannot possibly enjoin fractionalization. There is no way, nor should there be, for plaintiffs to limit the availability of alternatives to television viewing. Games, books, movies—even people—all divert potential viewers from the television set. It is impossible for plaintiffs or this court to isolate the diversion of Betamax from that of these competitors.

(3) Plaintiffs fear that time-shifting will reduce audiences for telecast reruns. The underlying assumptions here are particularly difficult to accept. Plaintiffs explain that the Betamax increases access to the original televised material and that the more people there are in this original audience, the fewer people the rerun will attract. Yet current marketing practices, including the success of syndication, show just the opposite. Today, the larger the audience for the original telecast, the higher the price plaintiffs can demand from broadcasters for rerun rights. There is no survey within the knowledge of this court to show that the rerun audience is comprised of persons who have not seen the program. In any event, if ratings can reflect Betamax recording, original audiences may increase and, given current market practices, this should aid plaintiffs rather than harm them.

On cross-examination, Sidney Sheinberg acknowledged an inconsistency in this prediction of harm. He further explained:

I think there is an inconsistency and I made that point in my deposition, I believe.

But what we are concerned about, Mr. Dunlavey, is the perceptions of people and the perceptions of buyers.

And there is also a nuance of distinction that is significant in the hearts and minds of people who deal, whether or not it is logically accurate, and that is between more people seeing something and the seeability being exhausted, as it were.

Now the television industry works under the theory that the more people that see a program the more successful it is, the more people will want to see it in repeats and in syndication.

That does not necessarily mean that they also don't work with the theory that the audience can be used up for a product.

(4) Plaintiffs suggest that theater or film rental exhibition of a program will suffer because of time-shift recording of that program. This suggestion lacks merit. By definition, time-shift recording entails viewing and erasing, so the program will no longer be on tape when the later theater run begins. Of course, plaintiffs may fear that the Betamax owners will keep the tapes long enough to satisfy all their interest in the program and will, therefore, not patronize later theater exhibitions. To the extent that this practice involves librarying, it is addressed in section V.C., *infra*. It should also be noted that there is no evidence to suggest that the public interest in later theatrical exhibitions of motion pictures will be reduced any more by Betamax recording than it already is by the television broadcast of the film.

Plaintiffs' experts admitted at several points in the trial that the time-shifting without librarying would result in "not a great deal of harm." Plaintiffs' greatest concern about time-shifting is with "a point of important philosophy that transcends even commercial judgment." They fear that with any Betamax usage, "invisible boundaries" are passed: "the copyright owner has lost control over his program."

These "nuances," "perceptions," and "points of philosophy" are understandable, though not always logical. They do not, however, justify an injunction. Harm from time-shifting is speculative and, at best, minimal.

The audience benefits from the time-shifting capability have already been discussed. It is not implausible that benefits could also accrue to plaintiffs, broadcasters, and advertisers, as the Betamax makes it possible for more persons to view their broadcasts.

### C. *Librarying*

Plaintiffs' fear of harm goes beyond time-shifting use. They also fear that persons will not erase the tapes after one viewing but rather will build a library, *i. e.*, maintain the tapes for subsequent repeat viewing. Plaintiffs argue that persons who record and watch playbacks are removed from audiences for live television and entertainment alternatives. This contention fails for the reasons discussed above. (*See* V.B.2.) Plaintiffs also argue that a Betamax owner who has a copy will not watch the same program when rerun on television or re-released for theater exhibition.

This prediction also assumes too much. First, it assumes that a large number of Betamax owners will have both the desire and the income to maintain a library. Each tape costs approximately $20. An extensive library will be very expensive, and it has not been proven that many persons will "library" to any significant extent. Additionally, prerecorded discs of special programs or movies will compete with the Betamax recording. These prerecorded discs arguably are more desirable than off-the-air recordings. They have not been edited for television, and they have no commercials. Plaintiff Universal has already released full versions of "Animal House" and "The Sting" for $15.95 each. There was testimony at trial that Twentieth Century-Fox has already released fifty titles for software to be used on home videotape recorders.

To the extent that librarying does occur, it is not clear that movie audiences will decrease. There is no survey or other evidence showing that persons who own a copy of a movie will not attend a theater exhibition of that movie. Theater-going is usually a social event which affords persons a larger viewing screen, better sound and an unedited version of the film. Even if theater audiences did decrease, this decrease would be offset by the corresponding increase in the audience for the original telecast of movies. When this increase is anticipated and measured, revenue from the initial sale to television should be greater.

### D. *Avoiding Advertisements*

Plaintiffs have also speculated about the reaction of advertisers to Betamax. They predict that if Betamax owners use the pause control to delete commercials or the fast forward to pass them by, advertisers will pay less to networks and networks will pay less to producers and owners. It must be remembered, however, that to omit commercials, Betamax owners must view the program, including the commercials, while recording. To avoid commercials during playback, the viewer must fast-forward and, for the most part, guess as to when the commercial has passed. For most recordings, either practice may be too tedious. As defendants' survey showed, 92% of the programs were recorded with commercials and only 25% of the owners fast-forward through them. Advertisers will have to make the same kinds of judgments they do now about whether persons viewing televised programs actually watch the advertisements which interrupt them.

### E. *Injunction Would Not Be An Appropriate Remedy*

The possibility that some of plaintiffs' suggested harms will occur is neither sufficiently certain nor adequately threatening to warrant an injunction against the corporate defendants. Moreover, before issuing any injunction, a court must also consider the potential harm from the injunction itself. An injunction prohibiting the marketing of Betamax or requiring destruction of its off-the-air recording capability would deprive Sony of financial reward for years of investment and improvement of this technology. Even if it were deemed that home-use recording of copyrighted material constituted infringement, the Betamax could still legally be used to record noncopyrighted material or material whose owners consented to the copying. An injunction would deprive the public of the ability to use the Betamax for this noninfringing off-the-air recording.

Defendants introduced considerable testimony at trial about the potential for such copying of sports, religious, educational and other programming. This included testimony from representatives of the Offices of the Commissioners of the National Football, Basketball, Baseball and Hockey Leagues and Associations, the Executive Director of National Religious Broadcasters and various educational communications agencies. Plaintiffs attack the weight of the testimony offered and also contend that an injunction is warranted because infringing uses outweigh noninfringing uses.

Whatever the future percentage of legal versus illegal home-use recording might be, an injunction which seeks to deprive the public of the very tool or article of commerce capable of some noninfringing use would be an extremely harsh remedy, as well as one unprecedented in copyright law.

An injunction against the Betamax would be inefficient and unwise for other reasons. Its enforcement would be nearly impossible and in any event highly intrusive. The machines are in private homes. If defendants were ordered to recall these as plaintiffs request, this order would be unenforceable without extensive inquiry into the activities of Betamax owners in their homes.

As discussed above, this court finds that home-use recording of broadcast material is not an infringement, and that if it were, the corporate defendants would not be found liable for the activity. Even if the court had found otherwise, however, an injunction would not be issued. No likelihood of harm was shown at trial, and plaintiffs

admitted that there had been no actual harm to date. Thus there is insufficient evidence to support a finding of harm adequate to sustain the drastic remedy of injunction.

## VI. *SUMMARY*

This lawsuit presents to the court only some of the issues raised by the videotape recorder technology. The court finds that home-use recording from free television is not a copyright infringement and that, even if it were, the corporate defendants are not liable and an injunction is not appropriate.

This litigation leaves many issues undecided. Like the court in *Williams & Wilkins, supra,* this court recognizes that the full resolution of these issues is

preeminently a problem for Congress: . . . Obviously there is much to be said on all sides. The choices involve economic, social and policy factors which are far better sifted by a legislature. The possible intermediate solutions are also of the pragmatic kind legislatures, not courts, can and should fashion.

487 F.2d at 1360.

This court is bound by the factual context of this litigation. The facts do not show harm to plaintiffs even if infringing activity has occurred. Most of plaintiffs' predictions of harm hinge on speculation about audience viewing patterns and ratings, a measurement system which Sidney Sheinberg, MCA's president, calls a "black art" because of the significant level of imprecision involved in the calculations. Testimony at trial suggested that Betamax may require adjustments in marketing strategy, but it did not establish even a likelihood of harm. Nor did the testimony invoke concern that denial of monopoly power over home-use recording would significantly dissuade authors and producers from creating audiovisual material for television.

In so ruling, this court does not minimize plaintiffs' concerns. The new technology of videotape recording does bring uncertainty and change which, quite naturally, induce fear. History, however, shows that this fear may be misplaced. As Lewis Wasserman, Chairman of MCA, observed at trial: "[P]eople that have constantly forecast the doom of a particular industry in the entertainment industry have historically been wrong. . . . They forecast the doom of radio stations when television developed on the horizon. Radio stations are more profitable today than they have ever been." Television production by plaintiffs today is more profitable than it has ever been, and, in five weeks of trial, there was no concrete evidence to suggest that the Betamax will change the studios' financial picture.

## VII. *ORDER*

A judgment shall be entered as follows:

It is ordered, adjudged and decreed that:

1. Each of the plaintiffs' requests for injunctive relief is denied.

2. Each of the plaintiffs' requests for declaratory relief is denied.

3. The plaintiffs' requests for damages and profits are denied.

4. Noncommercial home-use recording of material broadcast over the public airwaves does not constitute copyright infringement. Such recording is permissible under the Copyright Acts of 1909 and 1976 and as a fair use of the copyrighted works.

5. No defendant has competed unfairly with either plaintiff or engaged in unfair and fraudulent business practices in violation of 15 U.S.C. § 1125(a) or the laws of California.

6. No defendant has unlawfully and intentionally interfered with the contractual and advantageous business relationships of either plaintiff.

7. None of the retail or corporate defendants is directly, contributorily or vicariously liable for home-use copying.

Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the court finds that there is no just reason for delay and directs that a final judgment shall be entered in accordance with Rules 58 and 79(a) in CV 76–3520–F. In the event that this judgment is determined not to be final, pursuant to 28 U.S.C. § 1292(b), the court

declares that this opinion involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation in this case.

IT IS FURTHER ORDERED that the clerk forthwith serve copies of this memorandum opinion by United States mail upon counsel for the parties appearing in this action.